**Opinion issued May 11, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00961-CV

———————————

## IN RE L. M. M., A CHILD

---

**On Appeal from the 257th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-17733**

---

## O P I N I O N

This is an appeal from an order terminating Mother's parental rights to her

minor son, L.M.M., on the grounds that she "knowingly placed or knowingly

allowed the child to remain in conditions or surroundings which endanger the

physical or emotional well-being of the child," and that termination was in the

child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (b)(2). We affirm.

## BACKGROUND

L.M.M. sustained serious injuries that were first referred to the Department of Family Protective Services on April 2, 2015, when L.M.M. was 7 months old. Mother denied injuring him and denied any knowledge about the source of the injuries. On April 29, 2015, the Department filed a suit for protection and was granted temporary managing conservatorship. L.M.M. was placed with his Aunt and Uncle, where he has since remained, and they would like to adopt him.

On November 22, 2016, a trial was held on the Department's petition to terminate Mother's and Father's parental rights that centered largely on evidence about who L.M.M. had been left with who might have repeatedly injured him. The trial court terminated both Mother's and Father's parental rights. Only Mother appealed, challenging the sufficiency of the evidence to support the trial court's order.

### A. September – November, 2014

L.M.M. was born on September 1, 2014. For the first three months, Mother lived in an apartment with her mother, Vickie, and L.M.M. Father was not present in Mother's or L.M.M.'s life. Mother did not work and was L.M.M.'s primary caregiver. Mother testified that Vickie was a cook for a Head Start program.

Mother did not have her own transportation, but often she and L.M.M. would go to work with Vickie. Sometimes Mother would leave L.M.M. there to be taken care of by Vickie and Vickie's co-workers. Mother believed L.M.M. was well-taken care of there. She testified that, when she would return, L.M.M. would be "laughing and giggling and looking around like a happy baby." During this time, Mother testified that she never observed any injuries on L.M.M.

Vickie also testified that she never observed any injuries on L.M.M. during this period that they lived together.

Vickie's supervisor B. Turner, also testified about keeping L.M.M. for Mother at Vickie's workplace. Turner "always observed [Mother] as a loving and caring mom, and she always was protective of [L.M.M.]." Turner testified that L.M.M. was always supervised and well taken care of when he was at their workplace. Turner never saw any marks or bruises on L.M.M.

Another of Vickie's co-workers, E. Gamble, likewise testified that she observed Mother being loving, caring, and affectionate towards L.M.M. Gamble never observed L.M.M. with any injuries.

Mother met Reynaldo, her cousin's husband, in October of 2014. They started dating shortly after they met.

**B.     December 2014 – January 2015**

Vickie moved out after November 2014. Mother and L.M.M. then lived alone together in the apartment in December 2015 and January 2016.  In January, Mother got a job with Dish Network.  Mother testified that, when she started work, Lisa—who she identified as her pastor's wife—took care of L.M.M.  Mother selected Lisa to take care of L.M.M. because "she stayed at home, and she was a loving, caring person."  During the month that Lisa cared for L.L.M., Mother never noticed any "type of injury or any signs that he had, in anyway, been harmed."

Lisa likewise testified that, during the approximately four weeks she kept L.M.M. while Mother was at work, L.M.M. was "clean and healthy and happy and well-fed and taken care of."  He was "growing and developing fine."  Mother always provided anything L.M.M. needed, and Lisa saw Mother being a "very attentive, good mommy."

**C.     February 2015**

At the beginning of February 2015, Mother decided to have her family take care of L.M.M. instead of Lisa to save money.  Mother's sister, Markisha, and Vickie would take turns keeping L.M.M. while Mother was at work.

Markisha and Vickie testified that they did not notice any injuries on L.M.M. during February 2016.  Vickie testified that Mother was a nurturing mother, and Markisha testified that L.M.M. "was well taken care of."  Both Vickie

and Markisha have seen Mother interact with her nephews and believe that she is good with kids.

Another change in February 2015 was that Mother and L.M.M. moved from their apartment into Reynaldo's house, where they lived with several of Reynaldo's relatives. Living in the house were Reynaldo, Reynaldo's mother (Helen), Reynaldo's father (Carmen), Reynaldo's sister (Arely), Reynaldo's sister (Ester), Ester's husband (Jiro), and Ester's son (Mason).

Mother testified that, on February 9, 2015, she went to work and Reynaldo stayed at home with L.M.M. When Mother returned home that day, five people were there—Reynaldo, L.M.M., Ester, Mason, and Helen.

About 15 minutes after Mother arrived home on February 9, she noticed L.M.M.'s head was bulging at its "soft spot." Reynaldo had to take a younger sister Arely somewhere, so Helen drove Mother and L.M.M. to the Memorial Hermann Hospital emergency room. Mother testified that a nurse diagnosed L.M.M. with a mild respiratory infection, and told her to have the pediatrician look at his bulging fontanel if it did not go down in three to five days.

Memorial Hermann's records of this visit were entered into evidence at trial. L.M.M. presented with a 101.3 fever. The records identified the "Chief Complaint" as "fever, fuzzy since yesterday and mother noticed bulging fontanel today." The reason for the visit was identified as "Fever." The medical exam

summary and discharge notes did not indicate identify any additional injuries or medical problems.  Mother testified that she did not follow up with the pediatrician because the bulge had gone down the next day.

**D.**     **March 2015**

Mother testified that, sometime mid-March, 2015, she noticed a rash "on the top of [L.M.M.'s] private area."  She took him to the doctor, who prescribed medication and told her to follow up in three days.  No medical records were introduced at trial from this episode, but hospital records from a later visit note that Mother and Reynaldo report this history as "a blister on [L.M.M.]'s penis."

Almost immediately, Mother noticed faint red marks on L.L.M.'s hands and feet.  She testified that she took pictures to show the doctor at the follow-up appointment from L.M.M.'s rash.  L.M.M. did not appear distressed at having his hands and feet examined by the doctor.  Mother believed L.M.M. was having a reaction to the medication he was recently prescribed.  No medical records were introduced at trial from this episode, but the Department's notes from contact with the doctor's office indicate no concerns about L.M.M., and that no signs of abuse or neglect were noted at that visit.

Mother testified that, later in March, she went for a walk with L.M.M. and noticed he had a bump on his forehead. She had the impression the bump was a mosquito bite because Mother would "welt up" when bitten as a child.  She took a

6

picture and called her mother Vickie for advice. Mother testified that she followed Vickie's advice to wipe the bump down with alcohol, change L.M.M.'s sheets and wipe down his bed. The bump receded within a couple of hours, and Mother testified that she did not see any additional bumps, so she did not seek medical care. Later hospital records note Mother and Reynaldo described this as "two bumps and bruises on [L.M.M.'s] forehead for which she took pictures but did not receive medical care" in reporting L.M.M.'s medical history.

Mother testified that she did not work in March, so she was "full-time taking care of" L.M.M. She and Reynaldo, however, did go out apartment hunting two times a week without L.M.M. These times, L.M.M. would stay with Reynaldo's sister, Ester.

## E. April – May 2015

Mother testified that, on April 1, 2015, Helen asked Mother to pick up Arely from school. L.M.M. stayed with Helen and Ester. Mother returned with Arely about one hour later. Mother testified that L.M.M. was sleeping, and Helen and Ester said they would bring him to Mother in her bedroom when he woke up. A few minutes later, Ester brought L.M.M. in. He was crying. Mother soothed him, and she and L.M.M. then took a nap together. Mother testified that L.M.M. had not been feeling well; he was spitting up and losing weight. She attributed this to

7

his transition from breast milk to formula. When Mother woke up, Reynaldo was holding L.M.M. Mother went to take a shower.

In a matter of minutes, Reynaldo came into the bathroom carrying L.M.M. and said, "there is something wrong with [him]." Mother saw L.L.M. was not moving and was barely breathing. Mother testified that, when she asked Reynaldo what happened, he said L.M.M. had been fine when Mother left the room, then L.M.M. was gassy, and then went limp and was barely breathing.

Reynoldo and Mother took L.M.M. to the emergency room at West Houston Medical Center. He was lethargic with a slow pulse and breathing. A CAT scan there revealed "bilateral subdural hematomas," i.e., bleeding of the brain. L.M.M. was transferred by ambulance to Texas Children's Hospital for more intensive care.

The tests run at Texas Children's Hospital revealed extensive injuries, some of which L.M.M. will never recover from, characterized as likely related to "nonaccidental trauma" and "consistent with child abuse." Injuries identified by the hospital included (1) several brain hemorrhages (of varying ages) and fresh blood in the brain, (2) at least 20 broken bones throughout L.M.M.'s body (also of varying ages), (3) multiple fractures in the hands and feet (likely caused by squeezing or closing of the fingers), and (4) broken blood vessels at the pinky.

8

The Department began an investigation into L.M.M.'s injuries when he was hospitalized and Texas Children's recognized that his injuries were likely caused by abuse. It was not able to determine who was responsible for the abuse.

Following more than a month of intensive treatment, L.M.M. was discharged from Texas Children's Hospital on May 9, 2015. The discharge notes contain the following summaries of the conditions identified:

Final Diagnoses:
Principal Problem:
   Non-accidental traumatic injury to child
Active Problems:
   Bilateral subdural hematoma
   Fracture of arm, multiple, closed
   Seizure
   Acute encephalopathy
   Bulging fontanelle in infant
   Fracture of 2nd-5th metatarsal bones of left foot
   Cerebellar stroke, acute
   Moderate malnutrition
   Dysphagia
   Muscle tone Increased
   Traumatic brain injury
   Fracture, finger, multiple sites
   Retinal hemorrhage

Reason for Hospitalization:
1. Non-accidental traumatic Injury to child
2. Bilateral subdural hematoma
3. Fracture of arm and legs
4. Seizures
5. Acute encephalopathy
6. Cerebellar stroke
7. Moderate malnutrition
8. Dysphagia
9. Traumatic brain injury

10. Retinal hemorrhage

The Department placed L.M.M. with Mother's brother (Steven) and Steven's wife (Judith) when he was discharged from the hospital. Judith testified that L.M.M. was in a "vegetative state with broken bones in his hands and feet and his head was bigger than normal" when he was placed with them. He could breathe on his own, but all nutrition was through a G-Button (a tube that feeds liquids and food directly to the stomach). Steven and Judith attended training to properly operate and clean the G-Button before they brought L.M.M. home from the hospital.

## F.     June 2015 – October 31, 2016 (date of trial)

In June 2015, Mother signed a Family Plan of Service agreeing to participate in various services. These included a psychological evaluation, parenting classes, and counseling. By the time of trial, she had completed all of her required services.

Reynaldo had been barred from visiting L.M.M. at the hospital because he had lied to the Department about his criminal background. He told the Department he did not have a criminal history, despite having been arrested for indecency with a minor in 2006. Mother continued living with Reynaldo when L.M.M. was discharged from the hospital, but they got an apartment away from his family.

Mother testified that she initially had no idea who injured L.M.M. She developed the belief between July and October of 2015—during her course of individual therapy—that it was Ester who had injured L.M.M.

Mother admitted at trial that she became pregnant with Reynaldo's child after L.M.M. was got out of the hospital and was placed with Steven and Judith. She lied to a Houston Police Department investigator about it, claiming that she was not pregnant. Reynaldo and Mother split up around September 2015, and Mother moved in with Vickie. Mother gave birth to Reynaldo's daughter, Layah, in January 2016. Mother testified at trial that she had not had contact with Reynaldo since early 2016. Layah is also in the care of the Department.

Shortly before trial, the Department filed a report summarizing L.M.M.'s physical condition, his ongoing physical struggles, and the level of care he needs:

> L.M.M. is a one (1) year old African American male. L.M.M. is a non-verbal toddler. L.M.M. sustained multiple injuries as a result of physical abuse. L.M.M. had multiple fractures in his hands and feet which was a result of possible squeezing, or possible closing of the fingers. There were broken blood vessels at the pinky. L.M.M. had subdermal hemotoma. Fresh blood in the brain, between the cerelbellum and 20 fractures total. The injuries L.M.M. sustained has impaired L.M.M. speech and motor skills. L.M.M. does not have full control of his head. L.M.M. is developmentally off task in his speech, crawling/scooting, rolling over or eating. L.M.M. has optic nerve damage which is causing impaired vision, although he is able to track and see shadows and possibly colors. L.M.M. has a G-button and is not yet eating by mouth. L.M.M. attends physical, occupational and speech therapy once per week. L.M.M. has been cleared at his swallow test to be fed puree'd food. At sight L.M.M. does look like a normal healthy toddler. L.M.M. does coo and smile often.

At trial, Judith testified about L.M.M.'s current condition and needs. L.M.M. can only see shapes with his blurred vision. He responds to touch in a good way. Steven and Judith have a nurse to help with L.M.M. eight hours a day, five days per week. The rest of the time, Judith primarily cares for him. He often cries through the night and, because he is non-verbal, she does not know what he needs, so she just tries to comfort him. She and Steven are very attached to L.M.M. and committed to caring for him long term.

Judith knows that Mother wants L.M.M. returned to her. Mother is willing to visit at Steven and Judith house, and Judith does not believe Mother's visits are harmful to L.M.M. Judith testified that Mother did not contact her on a regular basis to see how L.M.M. was doing. Judith acknowledged, however, that she was not always open to communicating with Mother throughout this process.

## G.     The Department's and Child Advocate's Recommendations

On September 25, 2015, the Department set a "Primary Permanency Goal of Relative Adoption" by Steven and Judith. The Department's report to the court stated that L.M.M. was thriving in their home, that they were ensuring he attended all his medical appointments, as well as speech, occupational, and physical therapy. Steven and Judith have been trained to care for L.M.M. They would like to adopt L.M.M.

The Department's Investigation Report states that Steven and Judith's home is appropriate for L.M.M., as it is clean, free of hazards, and spacious enough for the entire family. Steven and Judith are committed to providing for the financial needs of L.M.M., and Steven's income is sufficient to cover existing household expenses and to care for L.M.M. The report also contains summaries of the Department's interviews with Steven and Judith's family members. Uniformly, the family members interviewed and Department staff expressed a belief that Steve and Judith were loving, stable caregivers who would provide the needed and appropriate care of L.M.M.

L.M.M.'s Department caseworker, Y. Jenkins, testified about why the Department is recommending adoption by Steve and Judith despite Mother's completing her services. For one, "there has never been a perpetrator found in this case in regards to all the individuals that was in the house, and the mother was one of them." In addition, Jenkins opined that L.M.M.'s continued placement with Steve and Judith is in L.M.M.'s best interest because he has received continuous, loving and competent care. Jenkins also testified to her medical concerns about returning L.M.M. to Mother:

> My concerns are mom, knowing that whether or not mom it able to care for him, whether she's realistic as to the level of care that he needs at this point. He needs a lot of attention, even beyond his regular physical therapy and occupational therapy throughout the day he's receiving movement of his body because he's tight and movement of his legs, and movement of his arms, and so he needs that

13

consistently. He gets that from the nurse, and he gets that from his caregivers, even when the nurse is not there then the caregivers are still moving him and sitting him up and stimulating him just to have the two visits of the therapy per week is not enough for what he needs because he's very, he's just nonfunctional without somebody moving him.

Mother is unaware of what medications or foods L.M.M. consumes.

Jenkins also testified that the Department is concerned that it was never able to identify who injured L.M.M., and that Mother stayed in an environment where unexplained injuries resulting in bruising and swelling occurred. Mother denied knowing what happened (although at some point Jenkins remembers Mother opining that Ester was responsible)

L.M.M.'s Gardian Ad Litem, M. Peckis, likewise testified that she had concerns about Mother's ability to take care of L.M.M. Peckis observed, less than two months before trial, Mother being unable to feed L.M.M. through his G-button, so Steven had to show her how. At one of Mother's visits, Peckis also observed Mother fighting with, and threatening to push, a relative while holding L.M.M. Although Mother took her required classes, Peckis opined that Mother does not understand what care L.M.M. needs, and does not have the ability to care for him. For these reasons, Peckis's recommendation to the court was termination of Mother and Father's parental rights. She also opined that and adoption of L.M.M. by Steve and Judith was in L.M.M.'s best interest because "they have the ability and knowledge to care for the child and give him the best situation possible

14

for him to meet his needs with therapy and his special needs, and they provide a loving home with him, and he's bonded both with the two children in the home."

## H. The trial court's order

On November 22, 2016, the trial court signed a Final Decree of Termination, finding termination of both parents' parental rights to be in L.M.M.'s best interest. The order terminated Father's parental rights under § 161.001(b)(1)(N) (abandonment) and Mother's under § 161.001(b)(1)(D) (endangering conditions).

## ISSUES ON APPEAL

Father did not appeal the trial court's order. Mother appealed, raising two issues:

> "Was the Evidence Legally and Factually Insufficient to Support Termination of Appellant's Parental Rights Under Texas Family Code Section 161.001(b)(1)(D)?"

> "Was the Evidence Legally and Factually Insufficient to Establish that the Termination of the Parent Child Relationship between [Mother] and Child, L.M.M. is in the Child's Best Interest?"

## STANDARD OF REVIEW

Because parental-rights termination "is complete, final, irrevocable, and divests for all time that natural right[,] . . . the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). Clear and convincing evidence "means the measure or degree of proof that will produce in

15

the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). This heightened burden of proof results in a heightened standard of review.

When determining legal sufficiency, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-rights-termination case, we must consider all of the evidence, not only that which favors the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining factual sufficiency under the clear-and-convincing burden, we must consider whether the evidence is sufficient to produce a firm belief or conviction in the mind of the factfinder as to the truth of the allegation sought to be established. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We consider whether

16

disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

**GROUNDS FOR TERMINATION**

For parental rights to be involuntarily terminated, it must be found by clear and convincing evidence that the parent engaged in conduct set out in subsection 161.001(b)(1) and that termination would be in the child's best interest pursuant to subsection 161.001(b)(2). TEX. FAM. CODE ANN. § 161.001 (West 2014). Both elements must be established, and termination may not be based solely on the factfinder's determination of best interest of the child. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.M.*, 104 S.W.3d 642, 646 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In this case, the predicate section 161.001(b)(1) finding was under subsection (D), which provides for termination if the court finds, by clear and convincing evidence the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional

well-being of the child" and that termination is in the child's "best interest." TEX. FAM. CODE ANN. § 161.001(b)(1)(D),(2).

Under section 161.001(b)(1)(D), we examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 815 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also In re D.J.J.*, 178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.) ("The phrase 'conditions or surroundings' in section 161.001(1)(D) refers only to the acceptability of the child's living conditions and does not concern the conduct of the parents toward the children."). Although the parent need not have certain knowledge that an actual injury is occurring, under subsection D, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Mother does not dispute that L.M.M. was in an endangering environment, but argues that there is insufficient evidence that she *knowingly* allowed L.M.M. to remain in a harmful environment. She makes much of the fact that she took L.M.M. to the doctor when she noticed his head swelling, when she noticed he had a rash, and when he was ultimately admitted to the hospital with serious injuries in

March, 2015. She reasons that if the doctor or hospital did not identify L.M.M.'s injuries and abuse at these visits, she could not have known. We disagree.

The Texas Supreme Court has expressly rejected the argument that failure of a medical provider to identify abuse does not establish that a parent does not know that child is in an endangering environment. *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) ("While it is true that Lonnie sought medical care for J.P.B. multiple times and that J.P.B.'s doctors initially failed to diagnose the fractures, that evidence does not negate the jury's finding that Lonnie knowingly permitted J.P.B. to remain in a setting that was dangerous to his physical well-being.").

Mother also contends that the Department failed to offer any "evidence to show [she] mother knew L.M.M. was harmed or had the potential to be harmed." Mother testified that, during March 2015, she and Reynaldo left L.M.M. in the care of Reynaldo's family members twice a week while they looked for an apartment. Mother was not working, and she was L.M.M.'s primary caregiver in the one-month period leading up to L.M.M.'s hospitalization for injuries. "A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D." *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). There is evidence that L.M.M.'s injuries included multiple brain hemorrhages of varying ages and more than twenty

19

broken bones of varying ages. The medical records from Texas Children's Hospital characterize L.M.M.'s injuries as likely related to "nonaccidental trauma" and "consistent with child abuse." Given that Mother was L.M.M's primary caregiver, these unexplained ongoing injuries alone are some evidence in support of termination under subsection D.

Application of the appropriate standard of review requires that we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." Because it is within the factfinder's providence to judge a witness's credibility, a trial court can disbelieve a parent's testimony that he or she did not know how a child was repeatedly injured over a period of time if a reasonable factfinder could have. *J.P.B.*, 180 S.W.3d at 574; *see also C.H. v. Dep't of Family & Protective Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) ("The trial court was not required to believe Mother's testimony that she did not know C.H. had sustained" multiple broken bones that were in various stages of healing, and the doctor characterized at least one as non-accidental).

There were numerous inconsistencies in Mother's testimony that cast her credibility into further doubt, including an ever-shifting story about whether L.M.M. had possibly been injured falling off of a bed at some point. Mother also admitted at trial that she had lied to investigators in L.M.M.'s case and falsely denied being pregnant again.

In early April 2015, Mother told Texas Children's hospital that she had noticed "bumps and bruises" on L.M.M. in March. Although Mother testified that she did not seek medical treatment for these because she thought they were mosquito bites, the court could have found this testimony not credible. *See In re S.H.A.*, 728 S.W.2d 73, 87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (failure to provide medical care can support finding of endangerment). Mother and Reynaldo also claim that on the day L.M.M. was hospitalized, L.M.M. peacefully awoke from a nap and—in the few minutes Mother left L.M.M. with Reynaldo to go get into the shower—L.M.M. suddenly became lethargic, was barely breathing, and had to be rushed to the hospital with severe, permanent injuries. The trial court was entitle to conclude this story was simply not plausible.

Considering all the evidence, including Mother's insistence that she was not aware of about any of L.M.M.'s injuries, there is sufficient evidence to produce a firm belief or conviction in the trial court's mind that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being" of L.M.M. under section 161(b)(1)(D). We overrule Mother's first issue.

## BEST INTEREST

There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex.

2006). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id*. "Moreover, the State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).

The Texas Family Code also provides a list of relevant considerations:

§ 263.307. Factors in Determining Best Interest of Child

(a)     In considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:

22

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

23

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

. . . .

TEX. FAM. CODE ANN. § 263.307 (West Supp. 2015).

Mother contends that, "[w]hen all the evidence is considered in light of the *Holly* and §263.307(b) factors it is clear that no rational trier of fact could have formed a strong conviction or belief that severing the mother-child bond was in the child's best interest." She points out that she completed all of her services, including therapy and parenting classes. She took a class on how to care for L.M.M.'s G-Button, and she attended most bi-monthly scheduled visits. Mother denied knowing who had injured L.M.M., but came to suspect Ester. She thus encouraged HPD to reopen the investigation to look at Ester. Mother has graduated from a dental assistant program, and Vickie has agreed to help Mother look after L.M.M. She accordingly asks this Court to hold that termination of her parental rights was not in L.M.M.'s best interest. According to Mother, L.M.M. should be placed with her or, alternatively, remain with Steven and Judith with Mother sharing joint managing conservatorship.

As a direct result of ongoing injuries sustained while in Mother's care, L.M.M. has many permanent disabilities and requires around-the-clock care. He

24

engages in several types of therapies and has not progressed cognitively or physically as would be expected from a toddler his age. His nutrition is delivered through a G-Button that requires special skill to operate and clean.

L.M.M. has been placed with Steven and Judith since his release from the hospital in May of 2015. They are willing and able to adopt him. They took classes to learn how to care for him before his release from the hospital, and have provided consistent, loving, and stable care since the placement. Judith is home full-time, and has a nurse who assists with L.M.M. L.M.M. has bonded with Steven, Judith, and the other children in their home. Their home study reflects that they have plenty of room in their home to raise L.M.M. and meet his needs.

The Department's caseworker, testified that—despite Mother completing her required classes—Mother does not seem to appreciate the amount of care L.M.M. needs. L.M.M.'s guardian ad litem expressed the same concern. She observed Mother's inability to feed L.M.M. through his G-Button shortly before trial. The guardian ad litem was bothered by Mother's physically threatening her sister while holding L.M.M. Both the Department's representatives and the Guardian ad litem opined that termination of Mother's parental rights and adoption of L.M.M. by Steven and Judith was in L.M.M.'s best interest.

We agree with the Department that "the evidence confirms a firm basis for the court's finding that parental termination was in the child's best interest," and "no evidence of significance is present to outweigh that decision."

We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's order terminating Mother's parental rights.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.