COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |
|---|---|
| § | No. 08-19-00070-CV |
| § | |
| IN THE INTEREST OF E.A.R., § | Appeal from |
| § | |
| A CHILD. § | 65th District Court |
| § | |
| § | of El Paso County, Texas |
| § | |
| § | (TC # 2017DCM5786) |
| § | |

## O P I N I O N

M.J. appeals from an order terminating her parental rights to E.A.R. The trial court also terminated the parental rights of L.D.R. but he has not appealed. We affirm.

## FACTUAL SUMMARY

M.J. and L.D.R. are the biological parents of E.A.R., who was twenty-one-months-old at the time of trial.[1] On August 23, 2017 at approximately 1:00 p.m., Mary and Lyle took three-month-old Eddie to the emergency room at El Paso Children's Hospital with a fever and congestion. According to Mary, Eddie had been congested for one week and she had been treating the fever with Tylenol, but the fever continued to spike. After observing bruising on the

---

[1] To protect the identity of the child, the opinion will refer to M.J. by the fictitious name "Mary", to L.D.R. by the fictitious name "Lyle", and to E.A.R. by the fictitious name "Eddie". *See* TEX.R.APP.P. 9.8.

child's face, torso, and back, the hospital staff made a report to the El Paso Police Department at 3:28 p.m. on August 23.[2] A police officer went to the hospital and began an investigation. A nurse at the hospital advised the officer that in addition to the bruising, they had discovered that the child had a torn frenulum which is typically caused by a bottle or some other object being forced into the child's mouth. Photographs were made of the child's injuries.

Hospital staff also made a report to Child Protective Services on August 23, 2017 that Eddie had unexplained non-accidental injuries, including bruising and a torn frenulum. Kimberly Blair-Santaella, an investigator with the Texas Department of Family and Protective Services, went to the ER at Children's Hospital to investigate. Blair-Santaella spoke with hospital personnel and learned that Eddie was undergoing additional testing including a full skeletal survey and testing to determine whether the child had any blood clotting abnormalities. Blair-Santaella examined Eddie and found cuts around his nose, bruising on his face, and numerous circular bruises on his stomach and the front of his torso. He also had bruises on his back. The bruises were different colors.

Blair-Santaella spoke to Mary and Lyle about Eddie. Mary told her that she and Lyle were Eddie's sole caregivers. Even though the bruises were readily visible to medical personnel and Blair-Santaella, Mary claimed to have not seen them. Mary explained that Eddie had been sick for three days and she had not changed his clothes or bathed him because she did not want to get him wet. Mary had changed Eddie's diapers but did not see the bruises on his stomach. When asked to explain how the injuries might have occurred, Mary speculated that they could have been caused by the car seat or perhaps her siblings had played too rough with him when they had visited at the maternal grandmother's house a week earlier. Mary did not express any concern about Eddie's injuries. Eddie was admitted to the hospital. After speaking with the

---

[2] The trial court took judicial notice of the police reports and medical records on file in the case.

maternal grandmother, Blair-Santaella created a safety plan which prohibited the child's discharge from the hospital and restricted Mary and Lyle to supervised contact in the hospital. Blair-Santaella left the hospital. She returned to the hospital the following day and attempted to speak with Lyle about the bruising on Eddie. Lyle became extremely angry and said that the medical personnel in the emergency room had bruised Eddie. Mary agreed with Lyle and blamed the hospital personnel.

Dr. Bert Emil Johannson, a pediatric intensivist and child abuse expert, consulted on the case to determine the cause of Eddie's occult fever. A chest x-ray had revealed what medical personnel initially believed to be pneumonia in the upper left lobe of the lung. Dr. Johannson conducted a physical examination and noted that while Eddie was clean and well-fed, he had a pattern of bruising on the front and back of his thorax which suggested physical abuse in an immobile three-month-old child. He also observed that the bruises were different colors indicating that they had occurred over a period of days. Eddie was also tender over his anterior ribs and posterior left-side ribs. Consequently, they ordered a skeletal survey which revealed that Eddie had multiple fractured ribs and a fractured arm. In light of those results, the doctors ordered a chest CT. That examination showed the presence of hematomas beneath the fractured ribs and those hematomas had become infected. Eddie eventually had to undergo surgery to drain an abscess that was causing the infection. Dr. Johannson also testified that Eddie had a torn frenulum midline beneath the tongue. He explained that the frenulum is "very difficult to tear" and he described Eddie's injury as a forcible tear. Dr. Johannson testified that a torn frenulum can be caused by someone pulling on the child's tongue or forcing an object in the child's mouth. Through testing, Dr. Johannson ruled out any diseases which might have caused the fracturing and bruising seen in Eddie.

In Dr. Johannson's opinion, Eddie's injuries were "absolutely caused by abuse of this child." He testified that it would have taken the force equivalent to a 25-pound bowling ball dropped from the distance of one meter to break a rib. In his opinion, an even greater amount of force was applied here because the broken ribs were tilted downward. Dr. Johannson concluded that the broken ribs were likely caused by a punch. He noted that the parents had not offered any plausible explanation for Eddie's fractures.

After receiving a call from Dr. Johannson, Blair-Santaella returned to the hospital to speak with Mary and Lyle about the rib and arm fractures. According to Blair-Santaella, the skeletal survey showed that the arm fracture was older than the rib fractures. Both parents denied any knowledge of the injuries or how they occurred. Mary did not say much in response to the news, but Lyle became angry and continued to insist that the Department should be investigating the hospital staff rather than them. On August 29, Blair-Santaella notified the parents that the Department was going to remove Eddie. The Department filed a petition for conservatorship and termination that same day. Eddie remained in the hospital until September 11, 2017, and he was placed in foster care.

The Department created service plans for both parents and engaged in efforts to reunify the family. After observing behavioral changes in both Mary and Lyle, the Department created a transition plan and both parents agreed to it. A few weeks later, however, the Department received an intake alleging physical abuse and neglect because Eddie had a diaper rash and bruises. After an investigation, the Department ruled out physical neglect, but it was unable to make a determination on all parties with respect to the physical abuse. The transition plan was put on hold and the parents went back to supervised visits.

The supervised visits went well and the Department developed a transition plan. Mary

and Lyle had overnight visits with Eddie from August 15-18. On August 19, the Department received an intake that Lyle had burned Mary's nine-year-old brother, V.J. Detective Paul Mata, who is assigned to the Crimes Against Children Unit of the El Paso Police Department, investigated the injury to a child offense which was alleged to have occurred on August 13, 2018, and conducted the forensic interview of V.J. V.J. accused Lyle of intentionally burning him with a hot fork. V.J. explained that he was cooking a weenie on a fork over the flame on the stove. Both Mary and Lyle were present. V.J. left the weenie cooking over the flame and Mary took it off of the stovetop but burned herself with the hot fork. Mary began crying and Lyle asked her what had happened. Mary explained that the hot fork had burned her and she gave the weenie and fork to Lyle. When V.J. extended his hand and arm to reach for the weenie, Lyle intentionally pressed the hot fork against V.J.'s shoulder and burned him. V.J. screamed in pain. Upon learning of the incident a few days later, V.J.'s father[3] reported the offense to the police on August 18. Lyle attempted to convince V.J. to say that the burn injury was an accident, but V.J. continued to state it was intentional. Detective Mata repeatedly attempted to speak with Mary and Lyle about the incident, but neither of them returned his calls. In October 2018, Detective Mata obtained a warrant for Lyle's arrest, but the warrant had not yet been executed when the detective testified in this case in February 2019.

The Department conducted its own investigation of the incident involving V.J. Lyle told the Department's investigator that it was an accident. Because the injury was consistent with the child's statement that Lyle had intentionally held the hot fork against his skin, the Department found V.J. credible and found reason to believe that Lyle had injured the child. On August 22, 2018, Mary contacted Illiana Ladd, a conservatorship caseworker with the Department, to discuss the incident involving V.J. Mary claimed that the injury to V.J. was an accident and V.J.

---

[3] V.J.'s father and mother are separated.

had been manipulated by her father to say it was intentional. At trial several months later, she testified that V.J. told her that he did not know whether Lyle had burned him intentionally. Mary admitted that she could clearly see the prongs of the fork in photographs of V.J.'s burn injury. Because Mary insisted that Lyle did not intentionally burn V.J., Ladd became concerned about Mary's ability to protect Eddie.

Cynthia Leede provided professional counseling services to Mary and Lyle. The purpose of her counseling was to assist both Mary and Lyle with improving their parenting skills and their relationship with one another and the child. She was also required to provide anger management counseling for Lyle, but that never occurred because both Mary and Lyle stopped attended counseling. Mary reported having racing thoughts and presented with anxiety and symptoms of depressed mood. Mary attended only two counseling sessions because she did not have transportation. During those sessions, Mary did not take personal responsibility or accountability for what happened to Eddie. She instead blamed the hospital staff for Eddie's injuries, or alternatively, she speculated that her siblings might have caused the injuries. Leede explained that part of the therapeutic process is taking accountability for your own actions whether it is for causing the injuries or leaving the child with someone else who caused the injuries. Thus, she expected the parents to show some degree of accountability, but neither did. Leede questioned Mary's ability to parent and protect the child based on the lack of accountability and the inability to address her own medical needs.

When the Department began the first transition plan, it recommended that Mary and Lyle obtain additional counseling because Mary was feeding Eddie items that caused him to have diarrhea. Eddie is lactose intolerant. Additionally, Eddie repeatedly contracted head lice during his parent-child visits, but Mary and Lyle denied the problem and refused to address it.

The evidence also showed that Mary and Lyle did not have stable housing during the pendency of the case. Mary and Lyle lived with grandmother following Eddie's birth, but they had to leave the home after the injury to V.J. Mary and Lyle subsequently lived with a friend from church, but the caseworker, Illiana Ladd, was unable to visit the home because she could not get an exact address from Mary and Lyle. After leaving that home, Mary and Lyle lived with another friend for one month and then with Mary's cousin for two weeks. Mary and Lyle purportedly rented a house from October 2018 to January 2019, but Ladd attempted to make five home visits and was never able to confirm that they lived there. At the time of the termination hearing, Mary and Lyle had separated and Mary was living with her mother who lives in government housing. Five children, including V.J., live in the home. Mary's mother has stage IV cancer and will require long-term care.

The Department decided to not move forward with reunification because Mary and Lyle: (1) never had a plausible explanation for Eddie's injuries even though they were the sole caregivers; (2) insisted that V.J.'s burn injury was accidental; (3) lacked the capacity to protect the child; and (4) they did not have home stability. The trial court found that the Department had proven by clear and convincing evidence that Mary had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to § 161.00l(b)(l)(D), Texas Family Code, and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code. The court also found by clear and convincing evidence that termination of Mary's parental rights was in the child's best interest, and it appointed the Department as the child's permanent managing conservator.

## PREDICATE TERMINATION GROUNDS

In Issues One and Two, Mary challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings under Section 161.001(b)(1)(D) and (E). *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(D), (E). Parental rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001. Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the children. *See id.* Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In the Interest of A.B.B.*, 482 S.W.3d 135, 138 (Tex.App.--El Paso 2015, pet. dism'd w.o.j.). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). However, when a parent's rights have been terminated based on multiple grounds, including subsections D or E, we must address any sufficiency challenges directed at subsections D and/or E, even if the evidence is sufficient to support termination on other predicate grounds. *In re Z.M.M.,* No. 18-0734, --- S.W.3d ---, 2019 WL 2147266, at *2 (Tex. May 17, 2019) (per curiam); *see In re N.G.*, No. 18-0508, --- S.W.3d ---, 2019 WL 2147263 at *3 (Tex. May 17, 2019)(holding that due process and due course of law require an appellate court to review and detail its analysis as to termination of parental rights under subsections D or E). We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights

as well as the finding of best interest. *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.).

*Standards of Review*

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.O.A.,* 283 S.W.3d 336, 344 (Tex. 2009). We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *In the Interest of J.P.B.*, 180 S.W.3d at 573. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenge findings. *See In re J.F.C.*, 96 S.W.3d at 266. We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id.* If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

*Endangerment*

A parent's rights may be terminated if there is clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(D). Under subsection E, a parent's rights may be terminated if there is clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger the physical or emotional well-being of the child. *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(E). In the context of subsections D and E, the term "endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *A.S. v. Texas Department of Family and Protective Services*, 394 S.W.3d 703, 711 (Tex.App.--El Paso 2012, no pet.). Even though much of the evidence admitted at trial is relevant to both subsections, we will conduct a separate analysis for each.

*Section 161.001(b)(1)(D)*

Subsection D requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Texas Department of Protective and Regulatory Services*, 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). The child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex.App.--Houston [14th Dist.] 2014, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex.App.-- Houston [14th Dist.] 2017, no pet.). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra v. Texas*

*Department of Human Services*, 869 S.W.2d 574, 577 (Tex.App.--Corpus Christi 1993, no pet.). When seeking termination under subsection D, the Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.*, 101 S.W.3d at 776; *Ybarra*, 869 S.W.2d at 577. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist.] 2005, no pet.).

Mary argues that the Department introduced no evidence of Eddie's living environment with Mary or Lyle before August 23, 2017. In the context of subsection D, the term "environment" includes the conduct of the parents or others in in the home. *See In re S.R.*, 452 S.W.3d at 360; *In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). Further, a child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D. *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex.App.--Houston [1st Dist.] 2017, pet. denied); *In re J.D.*, 436 S.W.3d 105, 114 (Tex.App.--Houston [14th Dist.] 2014, no pet.).

Three-month-old Eddie was taken to the ER on August 23, 2017 with a fever and congestion. Hospital personnel observed that Eddie had non-accidental injuries, including a torn frenulum and bruising on his stomach and torso. Consequently, additional testing was performed. It was determined over the next couple of days that Eddie had suffered serious injuries, including fractured ribs and a fractured arm. Through testing, the doctors ruled out any

diseases which might have caused the fracturing and bruising seen in Eddie.

The expert witness, Dr. Johannson, testified that Eddie's injuries were "absolutely" the result of child abuse, and he concluded that the broken ribs were caused by a punch. According to Dr. Johannson, the force required to break the child's ribs exceeded that of a 25-pound bowling ball dropped from a distance of one meter. Dr. Johannson testified that the rib fractures occurred on a single day, but the bruising on Eddie's torso also occurred over a period of days. There is also evidence that the arm fracture was an older injury than the rib injuries. Mary and Lyle were Eddie's sole caregivers yet neither of them had any plausible explanation for the injuries. The presence of these unexplained, non-accidental fractures of various ages supports a reasonable inference that Mary and Lyle knew of the injuries and their cause, and supports termination under subsection D. *See In re L.M M.*, 522 S.W.3d at 45; *In re J.D.*, 436 S.W.3d at 114. We conclude that the evidence, viewed in the light most favorable to the challenged finding, was sufficient for a reasonable factfinder to have formed a firm belief or conviction that Mary knowingly allowed Eddie to remain in conditions or surroundings which endangered his physical well-being. *See In re L.M.M.*, 522 S.W.3d at 45 (evidence sufficient to support finding of endangerment under subsection D where mother was primary caregiver, child had unexplained injuries including multiple brain hemorrhages of varying ages and more than twenty broken bones of varying ages, and medical records characterize the injuries as likely related to non-accidental trauma and consistent with child abuse); *In re J.D.B.*, 435 S.W.3d 452, 464-66 (Tex.App.--Dallas 2014, no pet.)(evidence sufficient to support finding that parents knowingly placed or allowed one-year-old child to remain in conditions or surroundings that endangered his physical or emotional well-being where multiple physicians found no explanation for fractures apart from intentional infliction, new fractures stopped appearing when child was removed from

parents' custody, and parents' expert offered no explanation for torn frenulum and deep scratches on child's face).

In examining the factual sufficiency of the evidence supporting the finding under subsection D, we have considered whether the disputed evidence is such that a reasonable fact finder could not have resolved the evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. Both Mary and Lyle repeatedly insisted that they did not know how Eddie had sustained the injuries. Alternatively, they asserted that the hospital staff caused the bruises after Eddie arrived at the hospital. At trial, Mary denied that she or Lyle caused any of Eddie's injuries. Mary testified that she had never seen Lyle be violent with Eddie, strike, shake, or throw Eddie, or pull his tongue. She admitted that Lyle was alone with Eddie in mid-July 2017 when she was in summer school. Mary testified that she did not know whether Lyle did anything to Eddie when she was not present. She also did not recall whether she asked Lyle if he had caused the injuries. It was within the province of the trial judge, as the trier of fact, to evaluate the demeanor and credibility of all the witnesses, including Mary, and to weigh the evidence. *J.B.P.*, 180 S.W.3d at 574. The trial court could have reasonably concluded that Mary's denial of any knowledge of Eddie's injuries or how they occurred lacked credibility given the nature of the injuries, including the visible bruising on his stomach and torso. Mary's assertion that the hospital staff caused the bruising is inconsistent with the evidence showing that medical personnel discovered the bruising shortly after Eddie arrived at the ER. The hospital staff quickly reported the non-accidental injuries to both the police and the Department. Further, the evidence showed that the bruising had occurred over a period of days. Mary presented no explanation for Eddie's fractured bones or the torn frenulum. Despite the severity of the injuries, Mary also claimed that Eddie was a "very calm baby" and never cried in a manner indicating he

had been hurt or injured while in her care. She said that after Eddie had been admitted to the hospital for three days, she noticed that he would cry when they wrapped him but he never cried before that. After considering all of the evidence, including Mary's claim that she was not aware of any of Eddie's injuries, we conclude that a reasonable factfinder could have reconciled the disputed evidence in favor of the trial court's endangerment finding, and the trial court could have reasonably formed a firm conviction or belief that Mary knowingly allowed Eddie to remain in an endangering environment. *See In re L.M.M.*, 522 S.W.3d at 45. Accordingly, we hold that the evidence was legally and factually sufficient to support the subsection D endangerment finding. Issue One is overruled.

*Section 161.001(b)(1)(E)*

In Issue Two, Mary attacks the legal and factual sufficiency of the evidence supporting the trial court's finding that she engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(E). The term "conduct," as used in Section 161.001(b)(1)(E), includes both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex.App.--San Antonio 2000, pet. denied). Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *See A.S. v. Texas Department of Family and Protective Services*, 394 S.W.3d 703, 712 (Tex.App.--El Paso 2012, no pet.); *In re M.R.J.M.*, 280 S.W.3d at 503.

Under Section 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.--Fort Worth 2003, no pet.). Termination under this subsection must be based on

- 14 -

more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* When determining whether a parent has engaged in an endangering course of conduct, a fact finder may consider the parent's actions and inactions that occurred both before and after the child was born. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex.App.--El Paso 2015, no pet.); *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex.App.--El Paso 2012, no pet.). The conduct need not occur in the child's presence, and it may occur both before and after the child has been removed by the Department. *Walker v. Texas Department of Family & Protective Services*, 312 S.W.3d 608, 617 (Tex.App.--Houston [1st Dist.] 2009, pet. denied). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex.App.--Houston [14th Dist.] 2003, pet. denied).

The child sustained multiple fractured ribs, a broken arm, extensive bruising of his stomach and torso, and a torn frenulum while in the care of Mary and Lyle. The injuries occurred over a period of time and were not accidental. To the contrary, Dr. Johannson testified that the injuries were "absolutely" the result of child abuse. Even though some of the injuries were caused by significant force, Mary claimed to not have any idea that the child was injured at all or how the injuries occurred. While she stated that Eddie bruised easily and her younger siblings might have unintentionally bruised Eddie, medical testing ruled out the possibility of any blood-clotting disorders. Further, Mary had no explanation for the fractured bones and torn frenulum. The counselor, Ms. Leede, observed that Mary was protective of Lyle and did not say anything negative about him. Mary continued to be protective of Lyle throughout the pendency of the case even though her parental rights were at risk. In August 2018, Mary's younger

brother, V.J., reported that Lyle intentionally burned him with a hot fork. Mary approached the conservatorship caseworker a few days later stating that the injury to V.J. was accidental and V.J. had been manipulated by his father to state the injury was intentional. After an investigation, the Department concluded that the evidence, including photographs of the burn injury, was consistent with V.J.'s statement that Lyle intentionally burned him. At trial, Mary insisted that her back was turned when the injury occurred and V.J. told her that he did not know whether Lyle had intentionally burned him.

We conclude that the evidence, viewed in the light most favorable to the challenged finding, was sufficient for a reasonable factfinder to have formed a firm belief or conviction that Mary engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *See In re J.D.*, 436 S.W.3d 105, 115-16 (Tex.App.--Houston [14th Dist.] 2014, no pet.)(finding evidence legally and factually sufficient under subsections D and E where the child sustained two fractures at different times while in the parent's care, the injuries were not accidental, but were caused by extreme force, bone disease was ruled out, and the parent was the primary caretaker).

In examining the factual sufficiency of the evidence supporting the finding under subsection E, we have considered whether the disputed evidence is such that a reasonable fact finder could not have resolved the evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. As detailed in our analysis of the sufficiency arguments related to subsection D, both Mary and Lyle maintained that they did not know how Eddie had sustained the injuries. Their explanation that the hospital staff caused the bruises after Eddie arrived at the hospital is contrary to the evidence showing that the bruises were visible when Eddie was examined in the ER on the afternoon of August 23, 2017. Mary testified that she had never seen Lyle be violent with Eddie

or do anything which might have caused the injuries. Mary presented no explanation for Eddie's fractured bones or the torn frenulum. The trial court could have reasonably concluded that Mary's denial of any knowledge of Eddie's injuries or how they occurred lacked credibility given the nature of the injuries, including the visible bruising on his stomach and torso. After considering all of the evidence, we conclude that a reasonable factfinder could have reconciled the disputed evidence in favor of the trial court's endangerment finding, and the trial court could have reasonably formed a firm conviction or belief that Mary engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child. *See In re J.D.*, 436 S.W.3d at 115-16. Accordingly, we hold that the evidence was legally and factually sufficient to support the subsection E endangerment finding. Issue Two is overruled.

**BEST INTEREST**

In Issue Three, Mary argues that the evidence is legally and factually insufficient to support the best interest finding made under Section 161.001(b)(2) of the Family Code. A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of B.C.S.*, 479 S.W.3d 918, 927 (Tex.App.--El Paso 2015, no pet.); *In the Interest of R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re B.C.S.*, 479 S.W.3d at 927. Several factors must be considered in our analysis of the best interest issue: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the

home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927.

The first factor is the desires of the child. Eddie was only twenty-one months old when the case was tried. Consequently, there is no evidence of his desires. This factor is neutral.

The next two factors are the child's emotional and physical needs now and in the future, and the emotional and physical danger to the children now and in the future. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re R.A.G.*, 545 S.W.3d 645, 653 (Tex.App.--El Paso 2017, no pet.); *In re U.P.*, 105 S.W.3d at 230. The evidence supports the trial court's findings that Mary knowingly placed Eddie in an endangering environment and that she engaged in conduct endangering to his physical and emotional well-being. A fact finder may infer that past conduct endangering to the well-being of a child may recur in the future if the child is returned to the parent. *In re R.A.G.*, 545 S.W.3d at 653. Based on the evidence, the trial court could have determined that the second and third factors weigh heavily in support of the best interest finding.

The fourth factor is the parenting abilities of the individuals seeking custody. In reviewing the parenting abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the child. *D.O. v. Texas Department of Human Services*, 851 S.W.2d 351, 356 (Tex.App.--Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002). We have already concluded that the evidence is legally and factually sufficient to support the trial court's findings under Sections

161.001(b)(1)(D) and (E). While Mary completed her parenting classes, she consistently denied any knowledge of Eddie's injuries. Further, she failed to act to protect her younger brother, V.J., from physical abuse at the hands of Lyle. This factor weighs in favor of the best interest finding.

The fifth factor examines the programs available to assist those individuals to promote the child's best interest. The Department developed a service plan for Mary and she completed some of the required services. She was required to complete additional counseling, but Mary attended only two sessions. The counselor, Cynthia Leede, explained that part of the therapeutic process is taking accountability for your own actions whether it is for causing the injuries or leaving the child with someone else who caused the injuries. Mary did not show any degree of accountability during her counseling sessions. This factor provides some support for the best interest finding.

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the child by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. The factfinder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. Mary's plan is to reside in her mother's home with her four siblings even though she blamed her siblings for causing Eddie's bruises. Mary testified that she would not allow Lyle to have contact with Eddie but refused to state if that was because she viewed Lyle as a risk to Eddie. Mary's mother is ill and will require long-term care. Thus, it may become necessary for Mary to provide care for her mother and siblings.

The Department sought to terminate Mary's parental rights because she did not have the ability to protect Eddie, and it recommended that he remain in his current placement. Eddie has

been with his current foster parents since July or August 2018, and he is attached to them. Eddie has fully recovered from his injuries and is a "different child" than the one who left the hospital. The foster parents want to adopt him. The trial court could have determined that the foster parents will continue to provide a safe, stable, and nurturing home for Eddie whereas Mary's plan is not realistic. The sixth and seventh factors weigh in favor of the best interest finding.

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. The trial court found that Mary engaged in endangering conduct or she failed to protect Eddie from an endangering environment. At trial, Mary continued to deny any knowledge of how Eddie's injuries occurred even though she and Lyle were his sole caregivers. Based on this evidence, the trial court could have found that the existing parent-child relationship between Mary and Eddie is not a proper one because she has failed to demonstrate an ability or willingness to protect the child. This factor supports the best interest finding.

Finally, the ninth factor is whether there is any excuse for the parent's acts or omissions. The evidence in the record does not present a basis for finding an excuse for Mary's acts or omissions.

Applying the appropriate standards of review, we conclude that the trial court could have reached a firm conviction that termination of M.J.'s parental rights is in the best interest of the child. Accordingly, the evidence is both legally and factually sufficient to support the best interest finding. Issue Three is overruled. Having overruled each issue, we affirm the order terminating Mary's parental rights to Eddie.

August 21, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.