# Supreme Court of Texas

No. 23-0180

In the Interest of C.E., a Child

On Petition for Review from the
Court of Appeals for the Second District of Texas

**PER CURIAM**

B.K. (Mother) and C.E. (Father) are the parents of C.E. ("Carlo").[1] Carlo's skull was fractured when he was seven weeks old, and each parent blamed the other. A jury made the findings necessary to terminate Mother's parental rights under Section 161.001(b)(1)(D), (E), and (O) and Section 161.003 of the Texas Family Code, and the trial court rendered judgment on the verdict. The court of appeals reversed the termination, holding that each ground was unsupported by legally sufficient evidence. Because we conclude there is legally sufficient evidence Mother engaged in conduct that endangered Carlo's well-being, which supports termination under paragraph (E), we reverse the court

---

[1] We use an alias to identify the child and persons through whom the child could be identified, and we identify family members by their relationship to the child. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

of appeals' judgment and remand for further proceedings on Mother's remaining issues that the court of appeals did not address.

**I**

The Department of Family and Protective Services (DFPS) began an investigation after Carlo, a seven-week-old infant, was hospitalized with a fractured skull, a brain bleed, and retinal hemorrhaging on the afternoon of February 25, 2021. Nurse Donna Wright, the pediatric nurse practitioner who treated Carlo in the emergency room, indicated that the injury to his skull required significant force—such as that experienced in a major car accident or throwing an infant against a wall. As no car accident or similar event had occurred, Nurse Wright and Carlo's hospital care team determined Carlo's injuries were intentional. The hospital therefore notified DFPS and local law enforcement about Carlo's injuries.

Carlo's Mother and Father are veterinarians, and Father is also a Doctor of Pharmacy. When Carlo was born, Mother was 38 years old and Father was 45 years old. As the court of appeals recounted in detail, they had a turbulent domestic relationship. ___ S.W.3d ___, 2023 WL 170762, at *3-11 (Tex. App.—Fort Worth Jan. 12, 2023).

Neither Mother nor Father could provide an explanation for the injuries, and each blamed the other. Carlo's only caregivers during the relevant timeframe were Mother and Father, except for a brief period when Carlo's maternal grandfather (Grandfather) cared for him in a public place.

Investigators were initially concerned that Father had physically abused Carlo, but, as the investigation progressed, they concluded that

2

it was likely Mother who had done so. Both the attorney ad litem and the court appointed special advocate (CASA) representative for Carlo recommended terminating Mother's rights, and DFPS dropped the termination ground it had alleged against Father at trial. Mother was Carlo's primary caregiver, and the timing of Carlo's symptoms suggested the injury was likely inflicted when Carlo was in her care. This evidence, along with additional information such as Mother's behavior during the investigation, inability to answer questions consistently, and relevant mental health indicators, ultimately led DFPS to seek termination of Mother's parental rights.

The case was tried to a jury, which heard eight days of testimony from thirty-four witnesses. After deliberating, the jury made the findings necessary to terminate Mother's rights under Section 161.001(b)(1)(D), (E), and (O) and Section 161.003, and the trial court signed a judgment of termination.

Mother appealed and the court of appeals reversed, holding that there was legally insufficient evidence to terminate Mother's rights on each ground. *See* 2023 WL 170762, at *15-23. As to the Section 161.001(b)(1)(E) ground, the court was concerned with the possibility that someone other than Mother could have caused Carlo's injury, the testimony of Nurse Wright as to the timing of the injury, and the lack of causation evidence. *See id.* at *20-21. DFPS and Father filed petitions for review in this Court.

## II

We begin by addressing the correct standard and scope of our review. To terminate parental rights, the factfinder must find by clear

3

and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Clear and convincing evidence "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When the standard of proof is clear and convincing evidence, an appellate court reviewing the legal sufficiency of the evidence considers "all evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Courts "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," but courts "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

Here, the court of appeals was concerned that "the record shows inconsistencies in the facts as to what symptoms developed, when they developed, and how they were reported," and it concluded that "[f]or these reasons, the evidence is legally insufficient to find that Mother—or any other specific person—caused Carlo's injuries." 2023 WL 170762, at *21. Under the standard of review we have just described, however, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence.

Rather, a core function of the jury under any standard of proof—including clear and convincing evidence—is to resolve conflicts in

4

testimony, weigh evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, juries may consider circumstantial evidence, weigh witness credibility, and draw reasonable inferences from the evidence they choose to believe. *Benoit v. Wilson*, 239 S.W.2d 792, 797 (Tex. 1951). A reviewing court may not substitute its judgment for that of the jury. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005) ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary.").

The court of appeals also misapplied the standard of review by focusing on part of Nurse Wright's testimony in isolation and concluding that, according to that testimony, "the February 24-25 time frame for Carlo's injury is no more probable than any other time in the week before he was seen in the ER on February 25, and it is equally likely that something occurred before the two-day time period on which [DFPS] focused at trial and in the investigation." 2023 WL 170762, at *21. But reviewing courts must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *City of Keller*, 168 S.W.3d at 813-14. As explained below, a holistic review of the evidence paints a more complete picture of the disputed facts regarding when Carlo's injury occurred that a jury could have credited.

Turning to the proper scope of our review, we conclude that the court of appeals erred in excluding Nurse Wright's opinion testimony regarding causation of Carlo's injury. Mother did not object to Nurse

5

Wright's qualifications to provide such testimony in the trial court, nor did she raise the issue in the court of appeals. As with challenges to the reliability of expert testimony, a party wishing to complain that expert testimony is legally insufficient to support the judgment because the witness is not qualified must challenge the admission of the testimony before trial or object when it is offered at trial. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020); *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 143-44 (Tex. 2004).[2] In addition, if the trial court admits the testimony and the party wishes to challenge that ruling on appeal, it must assign the ruling as error in its brief in the court of appeals. *See* TEX. R. APP. P. 33.1(a); *Brumley v. McDuff*, 616 S.W.3d 826, 830 (Tex. 2021); *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 726 (Tex. 2016). Because Mother did neither in this case, the court of appeals should have considered all of Nurse Wright's testimony.[3]

---

[2] This requirement "gives the proponent a fair opportunity to cure any deficiencies and prevents trial and appeal by ambush." *Pike*, 610 S.W.3d at 786.

[3] In its erroneous review of Nurse Wright's qualifications, the court of appeals held that she was unqualified to provide testimony as to the probable timeframe of Carlo's injury because, as a registered nurse, she was "not qualified to medically diagnose the causation of a patient's injuries." 2023 WL 170762, at *20. As this issue was not preserved, we do not reach the merits of the court's holding that Nurse Wright was not qualified to provide medical causation testimony, but we note that some courts have concluded otherwise. *See Gregory v. State*, 56 S.W.3d 164, 180-81 & n.12 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd); *cf. In re R.D.*, No. 02-21-00125-CV, 2021 WL 4204999, at *2 (Tex. App.—Fort Worth Sept. 16, 2021, no pet.) (referencing testimony by pediatric nurse practitioner, permitted by trial court, that child's traumatic brain injury "was caused by excessive blunt force trauma" and child's death "was caused by nonaccidental trauma most likely inflicted by Father 'based on the history that he gave [her]'").

6

## III

Having thus defined our standard and scope of review, we consider whether there was sufficient evidence to terminate Mother's parental rights. Under Section 161.001(b)(1)(E), a person's parental rights may be terminated if the person "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). And under Section 161.001(b)(1)(D), parental rights may be terminated if the person "knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(D).

Importantly, although paragraphs (D) and (E) require conduct that places the child in danger or knowledge that conditions or other persons place the child in danger, these paragraphs do not require that endangering "conduct be directed at the child" or that the child "actually suffer[] injury." *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (internal quotation marks omitted). Instead, termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment. *In re W.J.H.*, 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 2003, pet. denied). And termination under (E) requires that a parent's conduct endanger the child's physical or emotional well-being. Proof that a parent specifically caused an injury is not necessary. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A finding of endangerment is supported "if the evidence . . . shows a course of conduct which has the effect of

7

endangering the physical or emotional well-being of the child." *Id.* at 534.

Here, the court of appeals reversed the jury's termination of Mother's rights under the endangerment paragraphs because it concluded there was insufficient evidence that Mother endangered Carlo either by directly causing his injuries or due to her mental health. But as just discussed, the paragraphs at issue do not require evidence that Mother directly harmed Carlo. And applying the correct standard of review to the entire record, we conclude there is legally sufficient evidence that Mother engaged in conduct that endangered the physical or emotional well-being of Carlo, which supports the jury's finding under paragraph (E).

As explained below, the evidence shows that only Mother and Father were alone with Carlo in a nonpublic place during the relevant window of time when Carlo's injury could have occurred, Mother was the primary caregiver while Father worked, and neither parent provided an explanation for Carlo's serious injuries. Both parents were medical professionals, and the jury heard extensive testimony about the turbulent nature of their relationship, which the court of appeals recounted in detail. *See* 2023 WL 170762, at *3-11. Given this evidence, it was within the jury's province to determine that both parents' inability to explain the violent injuries suffered by their baby was not credible. *See Benoit*, 239 S.W.2d at 797. And it was for the jury to weigh the parents' conflicting attempts to point fingers at each other and choose which evidence to credit. *See id.* We hold that circumstantial

evidence the jury could have credited is legally sufficient to support the inference that Mother was the person whose conduct endangered Carlo.

**First**, Carlo's injuries likely occurred on the evening of February 24. Nurse Wright initially opined that Carlo was injured within a week before he was brought to the hospital on the afternoon of February 25. She acknowledged that, because "everyone is different," it is impossible to say with certainty precisely when the injuries occurred within that window due to the parents' lack of explanation. But she emphasized objective assessment, explaining:

> The only things that we're able to look at is to -- to look at symptoms of what -- when a baby or a child is doing something that is not normal for him. That -- that is when we know that at some point around that time is when he would have been injured.

Applying this methodology, Nurse Wright concluded that the injury likely occurred on February 24.

The symptoms of Carlo's head trauma included seizures, vomiting, abnormal eating patterns, crying out in pain, irritability, and abnormal fussiness. Nurse Wright testified that if the onset of symptoms was Carlo's fussiness, noted by both parents on the evening of February 24, then that was likely when the injury occurred.

Nurse Wright also testified that Carlo presented at the emergency room with swelling on the afternoon on February 25, but he did not have swelling two hours earlier when he was seen by his pediatrician. She explained that "swelling can occur within a matter of minutes to hours, even to – it can even take a day." This evidence also makes it more likely that Carlo's injuries happened within twenty-four hours before he came to the emergency room.

9

**Second**, Mother and Father were Carlo's only caregivers during this time, except for one short period of time in a public place, as shown by Mother's meticulous feeding log for Carlo. Mother kept this detailed log, down to the individual hour, each day from January 6 to February 24, 2021. The log included documentation of Carlo's feeding, bowel movements, and notations of where Mother nursed Carlo and for how long. According to the log, the only documented times Carlo was not in Mother's care before he was hospitalized were when: (1) Grandfather cared for Carlo on February 24 while Mother attended a psychiatric appointment for approximately an hour; and (2) Father cared for Carlo during the night of February 24 while Mother slept. Grandfather testified that he did not injure Carlo, that Carlo acted normally when he saw him, and that he was only with Carlo in public places.

**Third**, neither Mother nor Father provided a plausible explanation for Carlo's injuries, which supports an inference that at least one of them knew their cause. *See In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (explaining that primary control of child combined with unexplained, nonaccidental fractures supports reasonable inference that child's caregivers knew of injuries and their cause). Mother's and Father's stories about what happened the evening of February 24 differed, and it was Father's story that remained most consistent.

Father testified that both Carlo and Mother were acting abnormally when he arrived home around 7:15 p.m. Carlo was "screaming, fussing" in an abnormal way, and Mother appeared more

10

stressed than he had ever seen her and screamed at Father to get a bottle for Carlo. Father consistently maintained that Carlo was uncharacteristically "fussy" and "crying hysterically." He explained that Carlo would scream any time he was adjusted or moved: "As I was sitting there, any time you moved just slightly, he -- he would jump."

Father testified that Mother then tried to feed Carlo, but he did not eat much. After Father ate dinner, he took Carlo to try to soothe him. Father talked with Mother for "about an hour," and she kept repeating, "I'm afraid you're going to take the baby from me." Father described Mother as "just kind of absent." Mother declined needing to go to the hospital and said she was "just tired," and at one point she abruptly started talking about going to the "Swiss Alps and be[ing] pulled in a sled by horses in the snow." Mother agreed to go to sleep between 10:00 and 10:30 p.m. Carlo slept on Father's chest during that time, and Mother woke up at 2:30 a.m. and took Carlo from Father.

Mother's position regarding when Carlo started acting abnormally has not been consistent. Mother told Nurse Wright that she had come home around 4:30 p.m. and Father came home around the same time. Mother also told her that Carlo had been a little fussy around 7:00 p.m., and the feeding log noted she had fed him at 6:30; Mother told a caseworker that Carlo had begun getting fussy around 6:30 or 7:00 p.m.

Dr. Shannon Lee Watts, Carlo's pediatrician, testified that Mother told her Carlo "became more fussy than usual" between 7:00 to 9:00 that evening. Mother told the jury that she only noticed Carlo's fussiness around 8:00 or 8:30 p.m. But Mother told a friend while at the

11

hospital that she saw Father holding a crying Carlo around midnight on February 24, then heard a "bloodcurdling scream," and thereafter Carlo "was having issues with his head." And Mother also told the jury that on the night of February 24 into the early morning of February 25, Carlo suddenly became "fussy" and began strangely vomiting.

Mother disputed that she and Father had any disagreement about the bottle or that she was angry. Instead, Mother testified that Father was angry and the disagreement was about the cohabitation agreement he gave her that night, as it was an agreement used when the relationship is ending—which was not what she expected. When Mother said she would not sign the cohabitation agreement, Father became "very irritated," raised his voice, and told her, "No, you're going to sign that. It's non-negotiable."

Mother told the jury she went to bed around 10:00 p.m. and got up around 1:30 a.m., at which point Carlo was getting fussy again, as he vomited after being fed and was hard to settle down. Father woke up again around 4:30 a.m. so Mother could sleep more, Mother woke up again at 6:30, and Father then left for work by 7:15. Carlo's fussiness continued throughout the morning of February 25, and Mother took Carlo to Dr. Watts at 2:00 p.m. after noticing Carlo's leg was twitching. Dr. Watts was very concerned that Carlo could be having a seizure and advised Mother to take him to the emergency room, at which point Carlo's skull fractures were discovered.

**Fourth**, Carlo's injuries were severe and very likely intentional. Carlo was hospitalized for eleven days. His retinas were actively hemorrhaging, his brain bleeding was so severe that he was placed in

the pediatric critical care unit, and it was unclear if he would survive or live a normal life if he recovered.

The jury heard extensive evidence that the injuries were intentional. They were the result of significant force, such as that from a serious car accident (which had not occurred) or from throwing Carlo against a wall. Nurse Wright performed tests to rule out bleeding, metabolic, and genetic disorders that could have caused Carlo's brain to deteriorate or degenerate. She also consulted peer-reviewed research, including a meta-study examining hundreds of research articles and literature on short falls and the significance of brain trauma. Carlo's brain hemorrhaging resulted from vessels that tore with significant force due to the acceleration and deceleration of the brain, and Nurse Wright gave the example of a car accident as illustrative of such movement. The retinal hemorrhaging in Carlo's eye was consistent with a "very high fall or shaking -- or a baby being hit by something or thrown into something." Nurse Wright explained that if the injury was unintentional or the result of some other less culpable explanation, that information would have very likely been shared with DFPS by Mother or Father. As she explained, "[h]is injuries were only to his head, so if -- if they are not an accident, then it's intentional or abuse."

**Fifth**, Mother made inconsistent statements throughout the DFPS investigation. A caseworker observed that Mother was unable to recollect any facts out of sequence without referring to her notes. DFPS investigators explained that they employed a technique of asking questions out of order, which makes it more difficult to maintain a coherent, false narrative. One investigator testified that when "we

13

asked about something specific the day prior or out of any kind of order, she -- she couldn't answer." Mother did not initially mention the "bloodcurdling scream" to Dr. Watts. When asked about the inconsistency, Mother stated that she didn't think the scream was important to mention earlier. Mother spoke about Carlo's injuries being caused by "specific, blunt trauma," then immediately thereafter mentioned a 10:30 p.m. "bloodcurdling scream" and said that "Father was sitting on the couch holding [Carlo]."

Mother also indicated that Father was responsible for Carlo's injuries, but with little supporting information. Mother told investigators that Father "attacked the child," that she "was held hostage," and that "she escaped." But when investigators asked for more details about how Father attacked the child, Mother could not provide any further information. At trial, Mother testified, "I did not cause these injuries and I know that [Father] did," and "I know that he hurt my baby . . . [b]ecause I didn't hurt my baby." Mother never provided more support for her contention that Father injured the child. Mother also accused DFPS, law enforcement, and others she interacted with of bias and tampering with evidence.

**Sixth**, DFPS caseworkers and other investigators expressed concerns regarding Mother's behavior during the investigation and around Carlo. Special Investigator Brandi Dees testified that Mother asked, unprompted, during an interview, "Well, could [Carlo] have been dropped on a tile floor?" But Mother denied dropping or injuring him in any way. Officer George Zamarron testified that Mother appeared surprised by the seriousness of the fractures and that when he and

14

investigator Holly Mizer interviewed Mother on March 1, Mother "lacked emotion . . . no crying, no pleading as to how the injury happened or who could have done it."

During visits with Carlo, DFPS caseworkers observed Mother acting inappropriately with Carlo given his injuries, as well as her refusal to receive advice about how to care for Carlo with those injuries. Mother appeared to fixate on Carlo's head, often putting headbands, hats, and rabbit ears on his head to take photos despite his severe brain injuries. Mizer testified that Mother was inappropriately rough with Carlo given his injuries, "tickling and kind of digging on him." CASA representative and Carlo's guardian ad litem, Becky Bollinger, testified that Mother appeared to lack the ability to soothe Carlo and refused to take advice. Jada Green, permanency specialist, noted that Mother talked over a required education video discussing how to soothe a baby and coping skills to prevent injuring a child, wanting to discuss "a shaken baby case that she was familiar with." Mother would frequently express disagreement with Green's written record of her visits with Carlo, writing things in a space for parent feedback so that the record "c[a]me across as two different visits."

Bollinger testified that Carlo exhibited a strong and persistent "fear response" during Mother's visits. His whole demeanor was different with Mother than with anybody else, as he tried to push Mother away, would cry hysterically for long periods of time, and started throwing things in anger during her visits. Once Carlo became mobile, he would run or crawl away to hide in a corner and beat his head against the wall.

In contrast, Mizer described Father as "emotional" during visits with Carlo—he would see the baby and start tearing up. Mizer also testified that Father would get on the floor with Carlo and engage with him appropriately and that he asked a lot of questions about Carlo's health and his medical treatment. Maggie Ray, a permanency specialist, testified that "[Father] has shown that he can . . . work collaboratively with professionals, that he acknowledges that [Mother] may be a danger in the future to his child and that he is going to take steps to make sure that [Carlo] is safe in the future."

**Seventh**, we note that Mother has a history of mental health issues that the jury could have viewed as relevant to Carlo's injuries. Mother had been voluntarily hospitalized in the past, and she commented to her psychiatrist on the morning of February 24 that she felt she was "going into crisis." We emphasize that mental health conditions, standing alone, are not sufficient to show endangerment, and the party seeking termination must show actual endangering conduct. *See, e.g.*, *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (Busby, J.); *Carter v. Dall. County Child Welfare Unit*, 532 S.W.2d 140, 141-42 (Tex. Civ. App.—Dallas 1975, no writ). But a parent's mental instability may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In re S.R.*, 452 S.W.3d at 363-65; *Carter*, 532 S.W.2d at 141-42; *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

\* \* \*

We conclude that this evidence, taken together, is legally sufficient to support the jury's finding that Mother engaged in conduct that endangered the physical or emotional well-being of Carlo. *See* TEX. FAM. CODE § 161.001(b)(1)(E). The jury, as the sole arbiters of the credibility of the witnesses and the weight to give to their testimony, was entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case. Under the governing standard of review, courts must defer to the jury's resolution of these disputes. Having found sufficient evidence to uphold the termination of Mother's parental rights under paragraph (E), we need not address paragraph (D).

Accordingly, without hearing oral argument, *see* TEX. R. APP. P. 59.1, we grant DFPS's and Father's petitions for review, reverse the judgment of the court of appeals, and remand for further proceedings on Mother's remaining issues that the court of appeals did not address.

**OPINION DELIVERED:** March 1, 2024