**Opinion issued March 14, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23–00675-CV

———————————

## IN THE INTEREST OF K.H.G, A CHILD

———————————————————————————

**On Appeal from the 310th District Court
Harris County, Texas
Trial Court Case No. 2021-00544**

———————————————————————————

## MEMORANDUM OPINION

Appellee K.J.O. ("Grandmother") filed this private suit to terminate the

parental rights of appellant A.K.R. ("Mother") to her minor son, K.H.G. ("Kevin").[1]

---

[1]  Rule of Appellate Procedure 9.8(b) requires that in parental-rights termination cases, the Court's opinion and all papers filed in this Court refer to a minor by an alias, and the Rule permits uses of aliases to refer to the minor's parents and other

A jury found by clear and convincing evidence that: (1) Mother's parental rights should be terminated under predicate ground (E) because she engaged in conduct or knowingly placed Kevin with a person or persons who engaged in conduct which endangered the physical or emotional well-being of Kevin; and (2) termination of the parent-child relationship was in Kevin's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (b)(2). The trial court entered a written order terminating Mother's parental rights based on the jury's finding under predicate ground (E) and the best-interest finding. The order also appointed Grandmother as Kevin's sole managing conservator. Mother filed a combined motion for judgment notwithstanding the verdict and motion for new trial, but the trial court did not enter a written ruling on this combined motion.[2]

In four issues on appeal, Mother contends that the trial court erred by denying her combined motion for judgment notwithstanding the verdict and motion for new trial. Mother argues that: (1) the evidence was legally insufficient to support termination of her parental rights under predicate ground (E); (2) the evidence was factually insufficient to support termination of her parental rights under predicate

---

family members. *See* TEX. R. APP. P. 9.8(b). We have opted to refer to the family members by aliases.

[2] The appellate record does not show that the trial court ruled on Mother's motion for judgment notwithstanding the verdict, and the motion for new trial was overruled by operation of law. *See* TEX. R. CIV. P. 329b(c).

ground (E); (3) the evidence was factually insufficient to support the best-interest finding; and (4) the non-unanimous jury verdict terminating Mother's parental rights violated her right to due process. We affirm.

**Background**

Mother gave birth to Kevin, her second child, in September 2020. When Kevin was born, Mother lived with her then-boyfriend G.G. ("George"), as well as two adult roommates and the roommates' children. George was not Kevin's biological father, but Mother and George both signed an acknowledgement of paternity declaring under penalty of perjury that George was Kevin's biological father. Mother falsely signed the document so Kevin would have George as "a father figure in his life." The trial record indicates that Kevin's actual biological father is E.G. ("Edward"), but Edward had never been a part of Kevin's life.

**A.      Kevin's Injuries and Removal From Mother's Care**

One evening in October 2020, Mother attempted to feed one-month-old Kevin, but he was fussy and gassy. George gave Kevin a bath and then tried to feed him again. While Mother was in a nearby room, George called out to her that Kevin was choking and not breathing. Mother immediately called 911, and the dispatcher instructed George in performing CPR on Kevin. Mother's female roommate, who had some training in CPR, came out of her room due to the commotion and briefly

3

performed CPR on Kevin. Emergency medical personnel quickly arrived. Kevin was resuscitated and taken to Texas Children's Hospital in Houston.

Doctors discovered that Kevin had acute head trauma and numerous fractures of his ribs and legs in various stages of healing. Medical records admitted at trial reflected that Kevin had "bilateral subdural hemorrhages, as well as cortical laceration, or tearing of the brain tissue," and these injuries were "consistent with abusive head trauma."[3] Kevin had "multiple healing fractures . . . of virtually all of the ribs on the left side" of his body except three. Kevin also had "metaphyseal corner fractures in varying stages of healing." The medical records noted that Kevin's rib and leg fractures were caused by "nonaccidental trauma." Kevin ultimately spent three weeks recovering in the hospital.

Kevin's injuries were reported to CPS. CPS interviewed Mother and George, who each described the CPR incident as discussed above. Mother and George denied that they intentionally injured Kevin or were aware of any injuries before George

---

[3]     The medical records stated:

> Subdural hematomas occur when the bridging veins underneath the dura, the protective covering of the brain, tear. Tearing of these bridging veins occurs when an abrupt acceleration-deceleration force creates a shearing force on the veins. Cortical lacerations, or laceration of the brain tissue, is indicative of a traumatic force to the brain tissue, such as the same acceleration-deceleration force that causes subdural hemorrhage.

4

performed CPR on Kevin. Mother said that she and George were Kevin's sole caretakers, and George would help care for Kevin by bathing and feeding him. Mother said that Kevin had had difficulty keeping his feedings down since birth, and she had taken Kevin to the hospital twice to address the feeding issue. CPS found a "reason to believe" that Mother and George had physically abused Kevin. Mother and George voluntarily agreed to participate in parenting services and to place Kevin in the care of a friend.

In early November 2020, Kevin was released from the hospital into the care of B.T. ("Foster Father") and S.T. ("Foster Mother") (collectively, "Foster Parents"). Mother had briefly dated Foster Father a few years earlier before he met Foster Mother. Foster Father told CPS that he broke up with Mother after discovering that Mother had lied about having custody of her first child. Foster Father stated that he remained friends with Mother.

CPS referred the allegations of physical abuse by Mother and George to the Houston Police Department. According to the police report that was admitted into evidence at trial, Mother and George gave statements regarding Kevin's injuries that were consistent with what they told CPS. Both denied any knowledge of Kevin's injuries. Mother said that she had taken Kevin to the hospital several times to address his feeding issues. Doctors told her that Kevin had acid reflux or colic. Mother also said that Kevin would wake up in the middle of the night crying like he was in pain,

5

but doctors told her it was colic. Mother acknowledged without elaboration that she would get frustrated and had anxiety, but Mother denied hurting Kevin or knowing how he sustained his injuries.

Mother said she met George five months before Kevin was born. Mother denied that George had any anger issues. She acknowledged that George had previously been incarcerated and that George's biological children had accused him of sexually assaulting them. Mother did not believe the sexual abuse allegations because George had denied them when Mother asked about them.

Police also spoke to Mother's two roommates, a male and a female who were in a dating relationship. Both roommates stated that their only interactions with Kevin consisted of holding him occasionally, and they denied providing any care for Kevin. Mother confirmed this. The male roommate stated that he had seen Mother quickly grow angry with the female roommate. The female roommate stated that Mother had anger issues and seemed depressed. The police also spoke to Grandmother, Foster Father, and a CPS caseworker.

The police report also included a physician's statement describing Kevin's head injuries and rib and leg fractures as "concerning for a chronic pattern of physical abuse." The statement "suggest[ed] that [Kevin's] head trauma was acutely sustained" on the day of his admission to the hospital in October 2020 following the CPR incident. The statement also reported that "[Kevin's] multiple posterior rib

6

fractures had evidence of healing at that time. Therefore, they could not have been sustained during the reported CPR immediately prior to this current hospitalization," referring to Kevin's October 2020 hospital admission.

**B.     Grandmother's Involvement and Termination Proceedings**

Grandmother is Mother's biological mother. Grandmother lived in Tennessee with her wife, and they had been married for several years and were raising two young sons. Grandmother adopted her wife's biological son, who is about nine years older than Kevin. Grandmother and her wife also adopted Mother's first child, B.H. ("Bobby"), who is approximately three years older than Kevin.

At the end of December 2020—two months after Kevin was admitted to the hospital with the serious injuries described above—Mother called Grandmother in Tennessee one evening and asked Grandmother to drive to Houston to pick her up. Grandmother and Mother dispute much of what has been said between them. Grandmother testified at trial that Mother was "hysterical" because George had beaten her up. Mother denied that she told Grandmother George had beaten her up, testifying instead that she called Grandmother after getting into an argument with George.

Prior to this phone call, Mother had not told Grandmother that Kevin was injured, and Mother denied that she had even told Grandmother about her pregnancy or Kevin's birth. Grandmother testified that when Mother accused George of beating

her up, Grandmother immediately packed her bags and drove to Houston the same night. Grandmother testified that during the drive, Mother called and told her that Kevin's ribs were broken, but Mother did not mention that Kevin also had head trauma and leg fractures. Mother blamed Kevin's rib injuries on CPR that George performed on Kevin when Kevin stopped breathing. Grandmother visited Kevin at Foster Parents' house a few days after she arrived in Houston. During this visit, Grandmother learned the full extent of Kevin's injuries from Foster Parents.

The following month, in January 2021, Grandmother filed an original petition in a suit affecting the parent-child relationship. In this filing, Grandmother sought appointment as Kevin's sole managing conservator or alternatively as joint managing conservator with Mother. Within a few weeks of Grandmother filing suit, Mother and George signed affidavits voluntarily relinquishing their parental rights to Kevin and designating Foster Parents as Kevin's co-managing conservators and prospective adoptive parents. Foster Parents filed separate petitions in intervention seeking appointment as Kevin's managing conservators.[4] Mother filed a counterpetition seeking sole managing conservatorship of Kevin.

In July 2021, the trial court entered temporary orders appointing Grandmother as Kevin's temporary managing conservator and appointing Mother and George as

---

[4] Foster Parents also filed a motion to dismiss Grandmother's claims for lack of standing. The trial court denied the motion.

temporary possessory conservators. Grandmother moved Kevin to Tennessee to live with her and her family, including Kevin's half-brother Bobby, and Kevin lived there at the time of trial. Because Grandmother had initiated a private suit for appointment as Kevin's managing conservator, CPS ended their involvement with Kevin. Mother and George revoked their affidavits of voluntary relinquishment of their parental rights, and Foster Parents nonsuited their claims before trial.

In August 2021, Mother and George were arrested for allegedly inflicting serious bodily injury on Kevin. In October 2021, a Harris County grand jury returned indictments against Mother and George for injury to Kevin. *See* TEX. PENAL CODE § 22.04(a)(1), (b)(1), (e). Mother's indictment alleged that she "unlawfully, intentionally and knowingly cause[d] serious bodily injury to [Kevin], . . . a child younger than fifteen years of age," by "inflicting violent acceleration-deceleration forces on [Kevin] with [Mother's] hand"; by striking Kevin with a blunt object or her hand; by failing to protect Kevin and provide him adequate supervision; and by failing to provide Kevin with adequate and proper nutrition. The indictment against George made substantially similar allegations. The indictments were admitted into evidence at trial in this case, but the criminal charges against Mother were still pending at the time of this trial.

Within two weeks of Mother's indictment, Grandmother filed a first amended petition seeking to terminate Mother's and George's parental rights to Kevin.[5] Grandmother filed a second amended petition (the "live" petition) in April 2022. Grandmother requested that the trial court terminate Mother's and George's parental rights to Kevin and appoint Grandmother as Kevin's sole managing conservator. Grandmother alleged that Mother:

- knowingly placed or knowingly allowed Kevin to remain in conditions or surroundings that endangered Kevin's physical or emotional well-being;

- engaged in conduct or knowingly placed Kevin with persons who engaged in conduct that endangered Kevin's physical or emotional well-being;

- executed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided for by Family Code Chapter 161;

- had been convicted or placed on community supervision (including deferred adjudication community supervision) for being criminally responsible for the death or serious injury of a child under Penal Code section 22.04; and

- knowingly engaged in criminal conduct that has resulted in her conviction of an offense and confinement or imprisonment and inability to care for Kevin for not less than two years from the date the petition was filed.

*See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (K), (L), (Q).

Prior to trial, George signed an affidavit voluntarily relinquishing his parental rights to Kevin. The trial court orally rendered judgment that George had voluntarily

---

[5] Grandmother previously filed a first amended petition in February 2021, apparently to include information about Foster Parents after they intervened in this suit. This petition is irrelevant to our analysis. For ease of reading, we do not discuss this petition or renumber the amended petitions that followed it.

relinquished his parental rights to Kevin, and Grandmother's claims for termination of George's parental rights were not tried.

## C. Trial

Only two statutory predicate grounds for termination were presented to the jury: grounds (D) and (E) concerning endangerment of Kevin's physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E).

The trial court admitted numerous exhibits at trial, including:

- medical records from Kevin's October 2020 hospital admission detailing Kevin's head trauma and rib and leg fractures;

- medical records showing that Mother had taken Kevin to the hospital several times before the October 2020 admission for issues related to his feeding difficulties;

- the indictments against Mother and George for allegedly inflicting serious bodily injury to Kevin;

- records showing that Mother and George were arrested for these criminal charges;

- the indictments against George for allegedly sexually abusing his biological children in 2016 and 2017, before Kevin was born;

- the acknowledgement of paternity for Kevin signed by Mother and George;

- Mother's and George's affidavits voluntarily relinquishing their parental rights to Kevin in favor of Foster Parents;

- George's pretrial affidavit voluntarily relinquishing his parental rights to Kevin;

- the CPS report;

- the HPD police report; and

- photographs of Kevin while living with Grandmother, her wife, Bobby, and other family members during the pendency of this suit.

The jury also heard numerous witnesses' testimony. George testified first, but at the time of trial, he was facing pending criminal charges both for allegedly inflicting serious bodily injury to Kevin and for allegedly sexually abusing his biological daughter. Consequently, George asserted his Fifth Amendment right against self-incrimination and refused to answer every substantive question asked of him, including whether he had intentionally injured Kevin and whether he had previously told Mother that he took full responsibility for Kevin's injuries. *See* U.S. CONST. amend. V.

Lakeva Banks, a CPS caseworker who briefly worked on Kevin's case, testified that CPS made a finding of "reason to believe" the child abuse allegations against Mother and George. Banks acknowledged that when CPS first began investigating Kevin's injuries, Mother took a parenting class, and CPS's goal was family reunification. Banks testified that CPS ended its involvement when Grandmother filed suit. Banks testified that although CPS never determined who injured Kevin, Kevin's injuries were not accidental or consistent with CPR. Banks testified that "[s]omebody purposely hurt him."

Mother acknowledged that Kevin suffered serious injuries and that only she and George had an opportunity to cause the injuries, but Mother denied causing the injuries herself or knowing that George had done so. Mother testified that she

12

initially believed Kevin was injured during CPR, but she later believed that George had injured Kevin. Mother testified that she met George five months before Kevin was born, but he is not Kevin's biological father. George agreed to raise Kevin as his child and signed an affidavit acknowledging paternity of Kevin. Mother testified that George sometimes got frustrated while watching sports, but she denied that George was violent or unsafe around children. Mother denied that she knew about the sexual abuse allegations against George before Kevin was injured, which contradicted her statement to police that she already knew about the accusations and did not believe them. Mother testified that she did not believe the accusations against George initially. Mother also testified that it took her about a year to suspect that George had injured Kevin. Mother testified that George had written a letter to her accepting "full responsibility for this" and stating that Mother did not deserve to be accused of injuring her child.

Mother acknowledged that only she or George had an opportunity to cause Kevin's injuries because they were Kevin's primary caretakers. Mother provided most of Kevin's care before he was injured. George helped care for Kevin by bathing and feeding him. Mother testified that she was almost always at home with Kevin and provided most of his care, and she testified that she did not watch George "like a hawk" when he cared for Kevin. Mother testified that she only left George alone with Kevin one time while she went to the store for thirty to forty-five minutes.

13

Kevin was screaming and crying when she returned home, but she did not believe that Kevin was in pain. Mother also testified that she sometimes heard Kevin crying while she was showering, but she did not believe these were cries of pain. Mother testified that she took Kevin to the hospital multiple times to address feeding issues, but doctors never discovered any injuries. Mother ultimately testified that she did "everything in [her] power" and "what any parent would do" while taking care of Kevin.

Mother testified that she wanted custody of Kevin. Mother acknowledged that she signed an affidavit voluntarily relinquishing her parental rights to Kevin when Grandmother filed suit "to prevent [Grandmother] from being able to take [Kevin]," but she later revoked the affidavit because she wanted to raise Kevin. Mother testified that if Kevin was returned to her care, she would take time off work to bond with him, and she had a support system in Foster Father, his mother, and Foster Mother. She also relied on her aunt, B.F. ("Aunt Betty"), as part of her support system. Mother testified that she had obtained her GED by the time of trial.

The theme of Grandmother's testimony was that Mother had habitually lied and that Mother was a troubled child. As stated above, Grandmother's and Mother's testimony conflicted in some respects.

Grandmother acknowledged that Mother had consistently denied knowing who injured Kevin or how he was injured. Grandmother believed that Mother was

capable of causing Kevin's injuries due to Mother's "level of frustration and fear" with Bobby when he cried as a baby, but Grandmother denied ever seeing Mother harm a child. Grandmother did not offer any direct evidence or testimony showing that Mother caused Kevin's injuries or knew that George had caused them.

Grandmother testified that Mother had lied about two significant events when Mother was a child. First, when Mother was eleven or twelve years old, she accused her stepfather—Grandmother's husband at the time—of physically and sexually abusing her. Grandmother testified that she did not believe the accusations, and police and Tennessee's child-services agency ultimately determined that the allegations were unfounded. Second, when Mother was thirteen, she accused a young male of statutory rape. Grandmother testified that the young male pleaded guilty to the offense, but Mother later confided she had lied about these accusations. Mother denied that she was a liar generally and that she had lied about either of the sexual abuse allegations.

When Mother was fourteen years old, Grandmother relinquished custody of Mother to the State of Georgia, and Mother was placed in a reform home for girls. Mother voluntarily left the girls home when she turned eighteen, she did not complete high school, and she did not have stable housing or employment. Mother moved to Houston when she was twenty-two years old. After living in Houston for

15

about a year, Mother called Grandmother and asked to come home. Grandmother paid for Mother's bus ticket to return to Tennessee.

Mother had Bobby, her first child, in 2017, about three years before Kevin was born. When Mother told Grandmother that she was pregnant with Bobby, Grandmother rented an apartment for Mother on the condition that Mother would obtain a GED and get a job, but Mother moved out of the apartment within a few months. Mother was staying with her boyfriend when Bobby was born. Grandmother testified that Mother, the boyfriend, and Bobby stayed at Grandmother's house one night, and Grandmother found drug paraphernalia in the boyfriend's backpack.

Bobby was born with a serious medical condition called "imperforate anus."[6] This condition required two surgeries to correct, and Bobby temporarily had a colostomy bag that required frequent changing. Bobby also required at-home physical therapy to stretch his sphincter muscle after the surgeries. Grandmother testified that Mother "didn't have a steady place to live" during this time, so Bobby stayed with Grandmother occasionally. Grandmother testified that she provided most of Bobby's medical care, but Mother disputed the extent of her participation in Bobby's medical care. Grandmother testified that she took Bobby to his surgeries, and Mother did not attend them. Grandmother testified that Mother called her one

---

[6]     Grandmother testified that Bobby's "bowels did not come to the end of his body and he had no anal opening."

16

day and said she did not "have anywhere to live," and she asked Grandmother to "come and get him." Grandmother picked up Bobby and filed for emergency custody of Bobby the following day. Grandmother testified that Mother saw Bobby a few times before moving back to Houston when Bobby was six months old, but Mother testified that she saw Bobby many more times. Grandmother and her wife eventually adopted Bobby and have raised him ever since.

Grandmother testified that Kevin had lived with her for approximately two years by the time of trial. Kevin had bonded with Grandmother, her wife, and their two sons, and Kevin was attending daycare. The daycare director testified that Kevin was well-behaved and participated well at daycare. She also testified that Kevin had bonded well with Grandmother, her wife, and Bobby, and Kevin was happy to see them at the end of the day. Grandmother emphasized that terminating Mother's parental rights would ensure that Kevin would grow up with his half-brother in a stable home.

Grandmother's wife testified that she saw Mother get nervous, upset, emotional, anxious, and frustrated while caring for Bobby's medical condition. She testified that Mother is not truthful, and she would not let Mother babysit her children. She conceded, however, that she had not seen Mother harm a child. She intended to adopt Kevin if Grandmother prevailed at trial.

17

Grandmother's mother—who is Mother's grandmother—testified that Mother had lived with her for a period of time as a child, but Mother eventually had to move out because she was dishonest. Grandmother's mother also testified that Mother told her she had lied about the physical and sexual abuse accusations against Mother's stepfather. Grandmother's mother testified that Grandmother and Kevin have "a very healthy relationship," and she expressed concern about placing Kevin with Mother.

After Grandmother rested, Mother called two witnesses. Aunt Betty—who is Grandmother's sister—denied that Mother was a liar. Aunt Betty testified that she "[a]bsolutely" believed Mother's sexual abuse allegations against Mother's stepfather. Aunt Betty testified that she spoke to Grandmother about the accusations, but Grandmother "absolutely was not receptive to any conversation at all." Aunt Betty conceded that she did not report the allegations to police or child protective services. Aunt Betty was aware of the extent of Kevin's injuries, and she testified that Mother had told her that George injured Kevin.

Foster Father testified that he and Foster Mother had custody of Kevin for about six months after Kevin was released from the hospital in November 2020. Foster Father testified that Mother voluntarily relinquished her parental rights to Kevin because Mother "was afraid of [Grandmother]," and Foster Parents initially intended to adopt Kevin. Foster Father also acknowledged that when he and Mother

18

were dating, Mother had lied to him about having custody of Bobby. Foster Father testified, however, that he trusted Mother "completely." Mother regularly visited Kevin at Foster Parents' home when they had custody of Kevin, and Mother was "attentive and loving and helping out and wanting to spend time with [Kevin] as much as she could." Foster Father testified that he would allow Mother to babysit his children, and he denied that Mother posed a danger to children. Finally, Foster Father testified that his entire family supports Mother.

The jury charge included questions on predicate grounds (D) and (E), as well as on Kevin's best interest. The jury returned a non-unanimous verdict, voting 10–2 in favor of terminating Mother's parental rights to Kevin. The jury did not find that clear and convincing evidence supported termination of Mother's parental rights under predicate ground (D), but the jury did find that clear and convincing evidence supported terminating Mother's parental rights under predicate ground (E) because Mother had engaged in conduct or knowingly placed Kevin with a person or persons who engaged in conduct which endangered the physical or emotional well-being of Kevin. *See* TEX. FAM. CODE § 161.001(b)(1)(E). The jury also found that terminating Mother's parental rights was in Kevin's best interest. *See id.* § 161.001(b)(2).

The trial court entered a written order terminating Mother's parental rights to Kevin based solely on ground (E) and the best-interest finding.[7] The order further appointed Grandmother as Kevin's managing conservator. Mother filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for new trial arguing that the evidence was legally and factually insufficient to support the jury's verdict. *See* TEX. R. CIV. P. 301, 324(b)(2), 329b. The appellate record does not indicate that the trial court ruled on Mother's motion for judgment notwithstanding the verdict, and the motion for new trial was overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). This appeal followed.

## Sufficiency of Evidence

In her first and second issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's finding that Mother engaged in endangering conduct under predicate ground (E). In her third issue, Mother challenges the factual sufficiency of the jury's best-interest finding.

## A. Standard of Review

"A parent's right to 'the companionship, care, custody, and management' of her children is a constitutional interest 'far more precious than any property right.'"

---

[7] The order also terminated George's parental rights to Kevin based on his pretrial execution of an unrevoked affidavit of relinquishment of his parental rights. *See* TEX. FAM. CODE § 161.001(b)(1)(K). George did not appeal. The trial court expressly made "no findings" concerning Edward, Kevin's biological father.

*In re M.A.J.*, 612 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). A parent's interest "in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see In re J.F.-G.*, 627 S.W.3d 304, 311 (Tex. 2021) ("The United States Constitution and the Texas Constitution protect parents' rights to raise and nurture their children."). Consequently, courts "strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Parental rights are not absolute, however, and a parent who is not fit to accept the responsibilities of parenthood may have her parental rights terminated. *In re J.F.-G.*, 627 S.W.3d at 317; *In re A.J.D.-J.*, 667 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2023, no pet.).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right," courts apply a heightened burden of proof that requires clear and convincing evidence to support termination of a parent's rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re A.J.D.-J.*, 667 S.W.3d at 822. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re*

21

*J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is clear and convincing evidence, the Texas Supreme Court has held that the traditional appellate standards of review for legal and factual sufficiency are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a parental-rights termination case, reviewing courts consider "all the evidence in the light most favorable to the finding," "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022) (quoting *In re J.F.C.*, 96 S.W.3d at 266). But we may not disregard undisputed facts that do not support the finding. *Id.* The evidence is legally sufficient if a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *Id.*

In conducting a factual-sufficiency review in a parental-rights termination case, the reviewing court must weigh disputed evidence contrary to the finding against the evidence favoring the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We must consider whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of its finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence which a reasonable factfinder could not have credited in favor of its finding is so significant

that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

In reviewing the sufficiency of the evidence, we must not usurp the factfinder's role as "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d at 741 (quoting *In re J.F.-G.*, 627 S.W.3d at 312). "Deciding whether, and if so to what degree, to credit the evidence is the factfinder's role, not ours." *In re A.J.D.-J.*, 667 S.W.3d at 822–23 (citing *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009)).

## B. Predicate Ground (E) Finding

The jury found that clear and convincing evidence supported terminating Mother's rights under predicate ground (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E). In her first two issues, Mother challenges the legal and factual sufficiency of the evidence supporting this jury finding. We consider these issues together.

### 1. Governing Law

Multiple parties, including a grandparent, may file suit to terminate a parent's legal rights to her child. *Id.* §§ 102.003(a), 102.004(a). To terminate parental rights, Family Code section 161.001 requires clear and convincing evidence supporting two findings: (1) the parent's acts or omissions must satisfy a predicate ground for termination; and (2) termination must be in the child's best interest. *Id.* § 161.001(b);

*see also In re J.F.-G.*, 627 S.W.3d at 312. Section 161.001 provides twenty-one predicate grounds for termination of parental rights. TEX. FAM. CODE § 161.001(b)(1).

As stated above, the jury determined that Mother's conduct violated only predicate ground (E). Under predicate ground (E), a court may order termination of parental rights if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Subsection (E) focuses on the parent's conduct—including acts, omissions, or failures to act—and whether the evidence shows that the child's physical or emotional well-being was endangered as a direct result of the parent's conduct. *D.H. v. Tex. Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 59 (Tex. App.—Austin 2021, no pet.); *A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.).

Endangering conduct need not "be directed at the child," and the child need not "actually suffer[] injury." *In re J.F.-G.*, 627 S.W.3d at 312 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.* (quoting *Boyd*, 727 S.W.2d at 533). The factfinder may infer specific danger to the child's well-being from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. Exposing the child to a life of

uncertainty and instability endangers the child's physical and emotional well-being. *In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied).

Subsection (E) requires more than a single act or omission to support termination of a parent's rights. *D.H.*, 652 S.W.3d at 59. The evidence must demonstrate the parent's "voluntary, deliberate, and conscious course of conduct." *Id.* (quoting *In re M.L.L.*, 573 S.W.3d 353, 363–64 (Tex. App.—El Paso 2019, no pet.)); *In re M.A.J.*, 612 S.W.3d at 407. In determining whether the parent engaged in endangering conduct under subsection (E), the trier of fact may consider conduct that occurred before and after the child was born, conduct in the child's presence and outside the child's presence, and conduct before and after the child was removed from his parent's custody. *In re J.O.A.*, 283 S.W.3d at 345; *In re C.V.L.*, 591 S.W.3d at 750.

### 2. Analysis

Mother's legal and factual sufficiency arguments regarding predicate ground (E) are substantially similar. Mother argues that the evidence established only that Kevin was seriously injured, but the evidence did not establish who injured Kevin or how he was injured. Mother argues that no evidence shows that she engaged in any endangering conduct—much less a voluntary, deliberate, conscious course of conduct—that caused Kevin's injuries. Mother acknowledges that she and George were criminally charged for injuring Kevin and those charges were pending at the

time of trial in this case, but Mother argues that this evidence alone is insufficient to establish that she caused Kevin's injuries or knew that George had caused them.

In arguing that the evidence was factually insufficient, Mother argues that her pending criminal charges for injuring Kevin, Grandmother's testimony that Mother was capable of harming Kevin, and Mother's parenting of Bobby did not establish that Mother engaged in endangering conduct. To the contrary, Mother argues that she was attentive to Kevin's needs, including by taking Kevin to the hospital numerous times to address his feeding issues. Mother also argues that the evidence was factually insufficient to establish that she knew George had harmed Kevin or that George was capable of doing so.

Mother does not dispute that one-month-old Kevin sustained serious, nonaccidental injuries, which were discovered by doctors when Kevin was admitted to the hospital in October 2020. *See In re J.F.-G.*, 627 S.W.3d at 312 (stating that "endanger" means "to expose to loss or injury; to jeopardize") (citation omitted). Evidence admitted at trial confirmed the serious, nonaccidental nature of Kevin's injuries. For example, medical records described Kevin's injuries as "bilateral subdural hemorrhages" and "cortical laceration, or tearing of the brain tissue" that was "consistent with abusive head trauma" occurring from "an abrupt acceleration-deceleration force." Kevin also had "multiple healing fractures . . . of virtually all of the ribs on the left side" of his body except three. He also had leg fractures described

26

as "multiple metaphyseal corner fractures in varying stages of healing," which were caused by "nonaccidental trauma." Thus, the undisputed trial evidence established that Kevin sustained serious, nonaccidental bodily injury.

Nor does Mother dispute that only she or George had an opportunity to cause injury to Kevin because they were Kevin's sole caregivers. *See D.H.*, 652 S.W.3d at 59 (stating that subsection (E) focuses on parent's conduct, including acts, omissions, or failures to act). Mother testified that before doctors discovered Kevin's injuries, she was on maternity leave and was Kevin's primary caretaker, although George helped bathe and feed Kevin. Mother denied that she injured Kevin, and by the time of trial Mother believed George had injured Kevin without her knowledge.

Although Mother acknowledges this uncontroverted evidence—that Kevin sustained serious, nonaccidental bodily injury that only Mother or George could have caused—Mother argues that there was no evidence showing either that (1) her conduct caused Kevin's injuries, or (2) she engaged in a voluntary, deliberate, and conscious course of action.

As to Mother's second point, we disagree that there was no evidence of a voluntary, deliberate, and conscious course of action. *See id.* Mother does not address the trial evidence showing that Kevin's rib and leg fractures showed signs of healing, indicating that they had occurred over time. The medical records from Kevin's October 2020 hospital admission stated that while Kevin's head trauma was

27

"acute" and likely occurred on the day of admission, Kevin's rib fractures were "healing," and his leg fractures were "in varying stages of healing." The police report, which Mother admitted into evidence, included a physician's statement that "[s]ome of [Kevin's] fractures do have associated signs of healing, and may have been sustained at an earlier time." Banks, the CPS caseworker, testified that Kevin's injuries were not accidental, were in different stages of healing, and were inconsistent with the administration of CPR. Mother did not object to any of this evidence at trial, and she does not address it or challenge its admissibility on appeal.[8] The uncontroverted evidence thus showed that Kevin sustained multiple serious injuries that were in varying stages of healing and likely occurred on at least two separate occasions. This is significant evidence that Kevin's injuries resulted from a voluntary, deliberate, and conscious course of action, not from a single act or omission. *See id.*

As to Mother's first point, we also disagree that insufficient evidence established that Mother's conduct caused Kevin's injuries. *See* TEX. FAM. CODE § 161.001(E); *D.H.*, 652 S.W.3d at 59 (stating that subsection (E) focuses on

---

[8]     To the extent this evidence constituted inadmissible hearsay, Mother's failure to object to admission of the evidence on this ground meant that the jury could not deny the probative value of the evidence. *See* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

parent's conduct—including acts, omissions, or failures to act—and whether child's well-being was endangered as direct result of parent's conduct).

"A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause[.]" *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (applying rule to termination under predicate ground (D)) (quoting *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.)); *see also In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) (applying rule in affirming termination under predicate ground (E)). As discussed above, Mother does not dispute that while Kevin was in her primary care, he suffered nonaccidental fractures of varying ages. *See In re L.M.M.*, 522 S.W.3d at 45.

At trial, neither Mother nor George offered any explanation for how one-month-old Kevin was injured, even though Mother and George were the only two people who could have caused Kevin's injuries. Mother denied any knowledge of how Kevin was injured, although she testified that she suspected George had injured Kevin. George pleaded his Fifth Amendment right against self-incrimination in refusing to answer every substantive question, including whether he had injured Kevin intentionally and whether he had previously told Mother that he took full responsibility for Kevin's injuries. *See* U.S. CONST. amend. V. Banks testified that CPS never determined exactly who injured Kevin. Thus, Kevin's serious,

nonaccidental injuries remain unexplained, which supports a reasonable inference that Mother knew of Kevin's injuries and their cause. *See In re L.M.M.*, 522 S.W.3d at 45. Grandmother was not required to prove the cause of Kevin's injuries, particularly considering that Mother was always near Kevin during the first month of his life except for one period of thirty to forty-five minutes when Mother left Kevin alone in George's care. *See id.* (because factfinder is sole arbiter of witnesses' credibility, factfinder "can disbelieve a parent's testimony that he or she did not know how a child was repeatedly injured over a period of time if a reasonable factfinder could have").

Moreover, the jury was permitted to consider evidence of Mother's neglect or endangerment of Bobby, Mother's first child, to support a finding that Mother endangered Kevin's well-being. *See In re C.V.L.*, 591 S.W.3d at 750 (stating that trier of fact may consider conduct that occurred before or after child was born and conduct that occurred in or outside child's presence); *In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet) ("If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment."). Contrary to Mother's argument on appeal, the evidence of Mother's neglect of Bobby extended beyond her provision of his medical care.

Bobby was born with a serious medical condition. At the time of his birth, Mother was living with a boyfriend. Grandmother testified that she provided most

30

of Bobby's medical care, including changing a colostomy bag and providing physical therapy. Mother disputed that she provided little assistance in caring for Bobby's medical condition, but the jury was entitled to believe Grandmother's testimony over Mother's testimony. *See In re J.W.*, 645 S.W.3d at 741. Grandmother testified that Mother asked her to pick up Bobby one day because Mother had nowhere to live. Grandmother did so and then filed for custody of Bobby the following day.

Grandmother testified that Mother saw Bobby a few times after Grandmother took custody of him, and Mother moved to Texas when Bobby was six months old. Mother testified that she saw Bobby many more times than this, but the jury reasonably could have believed Grandmother over Mother. *See id.* Mother conceded that she did not provide any financial assistance to Grandmother for Bobby's benefit. Thus, Mother's neglectful conduct of Bobby supported a reasonable inference that Mother also engaged in endangering conduct towards Kevin. *See In re C.E.K.*, 214 S.W.3d at 497.

When viewing the evidence in the light most favorable to the jury's finding under predicate ground (E), we conclude that the jury could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed Kevin with George who engaged in conduct that endangered Kevin's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.W.*, 645 S.W.3d at 741.

We therefore hold that the evidence was legally sufficient to support termination of Mother's parental rights under predicate ground (E). We overrule Mother's first issue.

We further conclude the disputed evidence contrary to the jury's finding—which primarily consisted of Mother's testimony—is not so significant in light of the entire record that it prevented the jury from forming a firm belief or conviction that termination of Mother's parental rights to Kevin was appropriate under predicate ground (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d at 631. We therefore hold that the evidence was factually sufficient to support termination of Mother's parental rights under predicate ground (E). We overrule Mother's second issue.

## C. Best Interest Finding

In her third issue, Mother challenges the factual sufficiency of the evidence supporting the jury's finding that termination of Mother's parental rights was in Kevin's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

The best-interest inquiry is separate and distinct from the predicate-ground inquiry. *In re A.J.D.-J.*, 667 S.W.3d at 821. The best-interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). The evidence used to

32

prove the predicate grounds for termination may be probative of a child's best interest. *Id.* at 747–48; *In re A.J.D.-J.*, 667 S.W.3d at 821.

As a matter of public policy, "the best interest of a child is usually served by maintaining the parent-child relationship." *In re N.J.H.*, 575 S.W.3d 822, 833 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (quoting *In re J.F.C.*, 96 S.W.3d at 294 (Hankinson, J., dissenting)). Despite the importance of the parent-child relationship, however, the Texas Supreme Court has held that "protection of the child is paramount" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). Reviewing courts examine the entire record to determine a child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013); *In re N.J.H.*, 575 S.W.3d at 833. There is a strong presumption that a child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE § 153.131(b)); *In re N.J.H.*, 575 S.W.3d at 833.

We consider several non-exclusive factors in deciding whether sufficient evidence supported the jury's best-interest finding. *See In re J.W.*, 645 S.W.3d at 746; *In re N.J.H.*, 575 S.W.3d at 833. These factors include:

(1)    the desires of the child;

(2)    the child's emotional and physical needs now and in the future;

(3)    the emotional and physical danger to the child now and in the future;

(4)     the parenting abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the child's best interest;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the parent's acts or omissions that may indicate the existing parent-child relationship is not proper; and

(9)     any excuse for the parent's acts or omissions.

*In re J.W.*, 645 S.W.3d at 746 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see also* TEX. FAM. CODE § 263.307(b) (providing thirteen additional factors to consider in determining parent's willingness and ability to provide safe environment for child). These factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent-child relationship is in a child's best interest on a particular record. *In re A.J.D.-J.*, 667 S.W.3d at 822; *see also In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). A court may not terminate the parent-child relationship "if the evidence shows that a parent's failure to provide a more desirable degree of care or support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice." *In re N.J.H.*, 575 S.W.3d at 833–34.

As we determined above, the evidence is factually sufficient to establish that Mother engaged in conduct or placed Kevin with George who engaged in conduct which endangered Kevin's physical well-being. *See In re J.W.*, 645 S.W.3d at 747–

34

48 (stating that evidence probative of predicate-ground finding may also be probative of child's best interest). As discussed above, one-month-old Kevin sustained serious, nonaccidental injuries over a period of time while in Mother's and George's sole care. Although there was no direct evidence showing whether Mother or George caused Kevin's injuries, the distinction is immaterial. Mother was Kevin's primary caretaker, and she was always with Kevin except for one period of thirty to forty-five minutes when Mother went to the store and left Kevin alone with George. When Mother returned from the store, Kevin was screaming and crying. Mother denied that she caused Kevin's injuries or that she knew or should have known that George caused the injuries, but as discussed above, the jury was not required to believe Mother's denials. *See id.* at 741; *In re A.J.D.-J.*, 667 S.W.3d at 822–23. The best-interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). A reasonable jury could have determined that Mother's failure to protect Kevin from sustaining serious, nonaccidental bodily injury while in her care put Kevin's well-being and safety at significant risk. *See id.*

The fact that Kevin sustained these injuries while in Mother's care implicates several of the best-interest factors. *See id.*; TEX. FAM. CODE § 263.307(b)(3) (providing that in determining child's best interest, jury may consider "magnitude, frequency, and circumstances of the harm to the child"). As this Court has previously

35

stated, "past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *See In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Thus, a reasonable jury could have inferred that Mother posed a present and future danger to Kevin's emotional and physical well-being. *See id.*; *see also In re J.W.*, 645 S.W.3d at 746. In addition, a reasonable jury could have determined that Mother's parental abilities and ability to meet Kevin's physical needs in the future did not promote Kevin's best interest. *See In re J.W.*, 645 S.W.3d at 746. Finally, a jury could reasonably conclude that Mother's acts or omissions in failing to protect Kevin from sustaining serious, nonaccidental injuries and her failure to provide any excuses for her acts or omissions weighed in favor of a finding that terminating her parental rights was in Kevin's best interest. *See id.*

In addition to Kevin's injuries, the jury also heard testimony about Mother's parenting of her first child, Bobby. *See In re J.O.A.*, 283 S.W.3d at 345; *In re C.V.L.*, 591 S.W.3d at 750 (stating that trier of fact may consider conduct that occurred before or after child was born and conduct that occurred in or outside child's presence). Mother was living with a boyfriend when Bobby was born. *See In re J.W.*, 645 S.W.3d at 746 (stating that stability of home is best-interest factor). Bobby had a serious medical condition, and Grandmother provided a majority of Bobby's medical care. Mother and Grandmother disagreed about the extent to which Mother

36

assisted in Bobby's medical care, but the jury reasonably could have believed Grandmother's testimony that Mother provided little of Bobby's medical care. *See In re A.J.D.-J.*, 667 S.W.3d at 822–23. Grandmother testified that Mother eventually asked Grandmother to pick up Bobby because Mother did not have a place to live. *See In re J.W.*, 645 S.W.3d at 746 (stating that stability of home is best-interest factor); *In re C.E.K.*, 214 S.W.3d at 497 ("If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment."). Grandmother picked up Bobby, filed for emergency custody of him, and eventually adopted him. Mother and Grandmother disputed how much financial or other assistance Mother provided for Bobby and Kevin, but the jury was the sole arbiter of the witnesses' credibility and demeanor, and it reasonably could have chosen to believe Grandmother over Mother. *See In re J.W.*, 645 S.W.3d at 741. The jury could have inferred from Mother's neglect of Bobby's well-being that Mother similarly neglected Kevin's well-being. *See id.* at 746; *In re C.E.K.*, 214 S.W.3d at 497.

In contrast to Mother's parental abilities, Mother acknowledges on appeal that Grandmother and her wife "are currently raising two other boys along with [Kevin] and the boys seem happy and well-adjusted." The uncontroverted trial evidence showed that Kevin had lived with Grandmother in Tennessee for about two years at the time of trial. Grandmother was married, and she had custody of Bobby, Kevin's half-brother. Grandmother and her wife testified that Kevin had bonded well with

them and with Bobby. The director of the daycare that Kevin attended in Tennessee testified that Kevin was well behaved and participated in class. She also confirmed that Kevin had bonded well with Grandmother, her wife, and Bobby, and Kevin was excited to see them when they picked him up from school. Grandmother testified that she intended to enroll Kevin in Bobby's school when Kevin was the appropriate age. Importantly, the evidence showed that Kevin had not sustained any serious injuries since he was removed from Mother's care and placed in Grandmother's temporary care pending trial in this case.

This evidence bears on several best-interest factors. *See In re J.W.*, 645 S.W.3d at 746. The evidence indicates that Grandmother promotes Kevin's emotional and physical needs now and in the future; she does not pose any emotional or physical danger to Kevin; her parental abilities are adequate; she provides Kevin with a stable home; and she has an adequate plan for raising Kevin. *See id.*

Finally, this evidence is also relevant to the child's desires. *See id.* Kevin was only three at the time of trial, and he was thus unable to express his desires. As Mother argues, "[g]enerally, when children are too young to express their desires, this factor is considered neutral." *See In re M.A.J.*, 612 S.W.3d at 410. However, when a child is too young to express his desires, this factor encompasses the quality and extent of the child's relationship with the prospective parent. *See In re N.J.H.*, 575 S.W.3d at 834 ("When children are too young to express their desires, the fact

finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent.") (quoting *In re J.D.*, 436 S.W.3d at 118). The uncontroverted evidence established that Kevin had bonded with Grandmother, her wife, and Bobby; Kevin was well-cared for by Grandmother and her wife; and Kevin spent minimal time with Mother after Grandmother became his temporary managing conservator. *See id.*

Although a child's best interest is usually served by maintaining the parent-child relationship, *see id.* at 833, we conclude that the disputed evidence contrary to the jury's best-interest finding was not so significant in light of the entire record that it prevented the jury from forming a firm belief or conviction that termination of Mother's parental rights was in Kevin's best interest. *See* TEX. FAM. CODE § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 631. We therefore hold that the evidence was factually sufficient to support the jury's best-interest finding. We overrule Mother's third issue.

## D.    Conservatorship Finding

Although not raised as a separate issue on appeal, Mother also challenges the trial court's appointment of Grandmother as sole managing conservator. Because we have overruled Mother's challenges to the trial court's order terminating her parental rights, the order has divested Mother of her legal rights and duties related to Kevin. *See* TEX. FAM. CODE § 161.206(b). Therefore, Mother does not have standing to

39

challenge the portion of the order appointing Grandmother as Kevin's conservator. *See In re R.J.*, 579 S.W.3d 97, 120–21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (concluding that father lacked standing to challenge part of termination order appointing Department of Family and Protective Services as child's conservator after Court overruled father's challenge to part of order terminating father's parental rights); *In re J.D.G.*, 570 S.W.3d at 856 (same); *see also Ramirez v. Dep't of Fam. & Protective Servs.*, 667 S.W.3d 340, 348–49 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (same and citing cases). Because Mother lacks standing to challenge the conservatorship appointment, we lack subject-matter jurisdiction to review the part of the order appointing Grandmother as Kevin's sole managing conservator.

## Constitutional Issue

In her fourth and final issue, Mother contends that the non-unanimous jury verdict in this parental-rights termination case violated her right to due process. Mother's appellate brief does not cite to any part of the record showing that she raised this complaint in the trial court. Our review of the record reveals that Mother did not raise this complaint, including in her combined post-judgment motion for judgment notwithstanding the verdict or for new trial.

Rule of Appellate Procedure 33.1(a)(1) requires that to preserve error for appellate review, the record must show that the complaint was made to the trial court by timely request, objection, or motion stating the grounds for the ruling sought from

the trial court with sufficient specificity to apprise the trial court of the complaint. TEX. R. APP. P. 33.1(a)(1)(A). This error-preservation rule applies equally to complaints in a parental-rights termination proceeding that a party's due process rights were violated. *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (holding that party waived due process claim by failing to raise it in trial court); *In re J.J.G.*, 540 S.W.3d 44, 63 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("Because Mother failed to make a timely complaint . . . or otherwise raise a concern regarding her due process rights in the trial court, she waived this issue on appeal.").

Because Mother did not raise her constitutional challenge to a non-unanimous jury verdict in the trial court, we concluded that she has waived this issue on appeal. We overrule Mother's fourth issue.

## Conclusion

We affirm the trial court's order terminating Mother's parental rights to Kevin.


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.

41